# Wytheville

## STUART CIRCLE HOSPITAL CORPORATION V. ZENOPHINE CURRY.

June 12, 1939.

Record No. 2066.

Present, All the Justices.

138

The opinion states the case.

*Parrish, Butcher & Parrish* and *A. N. Heflin,* for the plaintiff in error.

*J. R. Tucker, Richmond Moore, Jr.,* and *Robert G. Cabell,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This action was instituted by Mrs. Zenophine Curry, hereinafter referred to as the plaintiff, for damages alleged to have been occasioned to her while an inmate of a hospital operated and conducted by the Stuart Circle Hospital Corporation, hereinafter referred to as the defendant. The negligence is alleged to have occurred in the performance of medical and nursing services by the agents, servants and employees of the defendant, which services the hospital had undertaken and held itself out to perform for the plaintiff.

There were two distinct injuries,—one resulting from the injection of a dye solution into her tissues by a physician interne employed by the defendant, and the other from the application of a hot water bottle upon her arm by a nurse also employed by the defendant.

A verdict for the plaintiff in the sum of $13,000 was affirmed by the trial court.

An extensive statement of the facts in the case is necessary because of the many fine legal distinctions sought to be made under the several theories of the parties. These facts, in view of the verdict of the jury, stated from the standpoint most favorable to the plaintiff, are as follows:

Mrs. Curry is a woman forty-two years of age. Her family consists of her husband and one son. Prior to the dates of the injuries complained of, she had been, for many years, according to her family physician, in a normal and healthy condition. She had led an active social and domestic life, and had from time to time accepted suitable employment to supplement the family income.

In January, 1936, having become somewhat tired, overworked and ill, she consulted her family physician, Dr. W. H. Parker. On his advice, she entered Stuart Circle Hospital for the purpose of rest, and having conducted an X-ray examination of her gall bladder. She entered the hospital on January 13, 1936. On that date Dr. Parker made a notation on the progress record chart of the hospital, under the heading, "Doctor's Orders"—"Gall Bladder Dye Test.

Usual Routine, * * *—P." He told Dr. Hodges, the X-ray technician of the hospital staff, that Mrs. Curry was to have an X-ray on the following morning.

The presence of gall bladder trouble is customarily determined by the use of the X-ray. Some hours prior to the subjection of a patient to the X-ray, a dye solution is injected into the blood stream of the patient, by means of a syringe, for the purpose of rendering the gall bladder sufficiently opaque to permit the registry of the X-ray. The solution consists of from 50% to 60% free iodine, and differs slightly in color from the blood. It is important that the solution be injected into a vein of the patient, not only in order that the flow of the blood may carry it into the gall bladder, but also because iodine is a caustic substance which will seriously burn human tissue if an excessive amount comes into contact with such tissue. When administered efficiently and correctly, the injection is harmless and practically painless. The injection of this fluid into the vein is one of the regular routine duties required of and performed by an interne, along with other incidental and supplemental services and treatment rendered in preparation for subsequent services to a patient by her physician or by the medical staff of the hospital. A charge is made by the hospital for such routine treatment and services, which are incidental to, but distinct from the work done by the attending physician, and is separate from the charges for room and board.

The defendant is a private corporation, and operates its hospital for profit and not for charity. Its charter powers include those of operating, managing and conducting a hospital in the city of Richmond; of operating, managing and conducting a nurses' training school in connection therewith; and of exercising all of the powers, general or specific, customarily exercised by hospitals.

The plaintiff entered the hospital as a paying patient. The president of the corporation, Dr. Charles R. Robins, testified in respect to the effect of her acceptance as such patient, that the hospital undertook, as a part of its busi-

ness, to give her nursing service, medical treatment and attention.

The hospital employed as an interne, a young physician who had received his medical degree six months prior to January, 1936. He was paid a compensation of $25 a month, given free board and lodging, and supplied with uniforms and shoes in return for his services. The hospital had the right to employ and discharge him. He had certain professional duties of a rotating nature to perform, and was so trained in the routine performance of duties required in the hospital that he could render a definite service at any time.

The custom is that the interne goes to the hospital after his graduation from medical school for the purpose of observing work done by the more advanced doctors, and to further prepare himself to perform duties in the field of medicine. After training and observation, he is permitted to do certain things without immediate supervision. The patient has no voice in the selection of the attending nurse or interne who performs the routine duties. Internes do not hold themselves out to practice medicine, nor do they have patients of their own. Their duties are laid out and assigned to them by an interne committee of the hospital. In the matter of technique, the duty of inserting a dye solution in the vein is specifically assigned to an interne who is usually considered more expert in that line than the average general practitioner.

The interne, on the night of January 13, 1936, pursuant to the instructions of Dr. Parker, proceeded to make an intravenous injection of the dye solution into the arm of Mrs. Curry. Three people were present in the room when the injection was given, Mrs. Curry, the interne and a graduate nurse, also in the employ of the hospital. The nurse did not observe the doctor's procedure.

Mrs. Curry refused to turn her head when the interne started the injection, and watched him during the whole of the operation. She gives the following account of his procedure:

" * * * Dr. Allen started the injection, and I watched him through the whole performance, and he said to me, 'Why don't you turn your head, Mrs. Curry, and not watch me; it might make you nervous?' I said, 'I don't mind watching you; I would rather watch,' and I noticed that he kept looking at the plunger—I guess that is what you call it—he kept plunging it and he said, 'Something is wrong here.' He said, 'Mrs. Curry, some of this fluid has gone into your tissue and you will probably suffer from it.'

"Q. Said what?

"A. 'You will probably suffer some pain from the fluid going into the tissue,' and I told him my arm was hurting. He said, 'If it hurts too much let me know,' and it hurt me so bad in the short time he had pressed the plunger and right much of the fluid had gone into the arm, and he said, 'If it hurts too bad, let me know,' and I told him—I said, 'Doctor, it is hurting so bad now that I just can't stand it; I feel like my arm is paralyzed.' He said, 'I am sorry but I will have to pull it out.'

"After he had got it in the vein as he thought—I don't know that he really and truly ever got it in, but I noticed that he was working his needle around like this, like he was still hunting for it after pressing the plunger when he said that something had gone wrong.

"Q. How much of what was in the cylinder or barrel of the syringe had been put into your arm before he told you some of it had gone into the tissue of your arm?

"A. Well, I would say one-third of it because I remember exactly how much was in there, and I would say one-third of it had gone into my arm before he pulled the needle out to make another injection."

Mrs. Curry suffered considerable pain from the time the injection was given. Hospital attendants undertook to alleviate her suffering by administering sedatives, even to the extent of giving her codeine upon the order of the interne.

The interne used a syringe containing 50 c. c. of the dye solution. Mrs. Curry says that one-third or approximately 17 c. c. of the fluid was injected into the tissues of her arm.

Three doctors testified that the condition of her arm was due to the dye solution entering the tissues. Although the interne says that not more than 1 c. c. of the fluid was extravasated into the tissues, all of the medical witnesses concur in the opinion that the extravasation of so small a quantity would have produced no serious results.

Mrs. Curry was suffering so acutely on the morning of January 14th, and her arm had stiffened through the joint of the elbow to such an extent that Dr. Parker, after observing her condition, directed that hot applications be placed on her arm. A graduate nurse, employed by the hospital, prepared and administered the applications. Mrs. Curry told the nurse that her arm was numb, and that she had no feeling in it. The nurse testified that at approximately one p. m., a hot compress of sterile sponges was applied to the arm, and the dressing was then wrapped in surgical wax. On this was placed a hot water bottle, which had been wrapped in two thicknesses of a bath towel. She said that before making the applications, she tested the heat of the gauzes by placing them against the back of her hand, and that they were only comfortably warm; and with reference to the temperature of the hot water bottle, that she placed it against her cheek and it was not too hot, but that she did not use a thermometer.

At two-thirty p. m. of the same day, a student nurse discovered that Mrs. Curry's arm was very red. Some time later, a further examination showed that her arm had blistered. The graduate nurse had not returned to inspect or check results until after the applications had been removed by the student nurse. At seven-thirty p. m. the interne opened the blisters and redressed her arm, using a plain sterile dressing and a small amount of lubricant. It was found that the hot applications had caused "considerable first and slightly second degree burns on the upper forearm." The burning is attributed either to the excessive heat or the length of the applications, or both. It appears that the burns will not cause any permanent trouble.

The injection of the dye solution into the tissues, however, has resulted in a partial sensory paralysis of the musculo-spiral and radial nerves of the right forearm and the permanency of that condition cannot be forecast.

The evidence is that the plaintiff has suffered excruciating pain, loss of sleep, a thirty degree disability in the use of her arm, and loss of the use of two fingers and the thumb of her right hand. She is restricted for most purposes to use of her left arm and hand. She cannot sleep at nights, and is subject to excessive nervousness. The scars from her burns were present at the date of the trial of this case in the lower court. Her arm was discolored and swollen. She could not feel hundreds of pins that were stuck into it. She has changed from a calm and normal person to one of a highly nervous temperament. No sedative has been found to help her, nor is there any known cure for her condition. She has incurred a large expense for doctors, drugs and hospital bills. She is compelled to employ extra personal service, and has lost the ability to fellow her occasional employment. As a result of her partial paralysis and nervous condition, she is practically an invalid.

There were conflicts in some of the details of the evidence, but these have been resolved by the jury.

The defendant assigns seventeen errors. The first three relate to the refusal of the trial court to strike the evidence of the plaintiff at the conclusion of all of the evidence, to set aside the verdict of the jury and enter a final judgment for the defendant, or to grant it a new trial. The remaining are directed principally to the granting and refusing of instructions. The assignments involve, more or less, a discussion of the same principles, and, therefore, will be treated together.

The theory of the defendant is that a hospital is not permitted, under the laws of this State, to practice medicine; that in the operation of its hospital, it cannot be held responsible for damages negligently inflicted by an interne of the hospital, while performing an act requiring the exercise of professional skill and judgment; that it cannot make a

valid contract to practice medicine or to perform services involving the exercise of professional skill and judgment, and, therefore, could not be guilty of breach of a contract, which it could not legally make; and that there was no evidence of negligence on the part of the hospital or its nurse, in applying the hot water treatment to the plaintiff's arm.

The plaintiff, on the other hand, contends that a hospital is specifically exempted by Virginia Code 1936, section 1618, from provisions requiring a license to practice medicine, at least to the extent of furnishing its patients nursing service and medical attention, such as is necessary and customary as a part of proper and adequate hospitalization; that for the purpose of furnishing such hospitalization its internes and nurses are its agents, servants and employees, subject to its control, direction and supervision; that even if the hospital be prohibited from practicing medicine it is liable for a breach of its contract in excess of its legal powers; and that the defendant, operating its hospital for private profit, upon her admission as an inmate for pay, undertook and impliedly agreed to furnish her such routine medical treatment, nursing and attention as is customarily the business of hospitals, and is responsible for any injuries resulting to her by reason of the negligence of the interne and nurse in the performance of such undertakings.

The provisions of Virginia Code 1936, chapter 68, "Regulating the Practice of Medicine," sections 1608 to 1623, relate to the education, examination, registry, etc. of individuals. Section 1618, as re-enacted and amended in 1928, includes certain exemptions and exceptions from examinations. In that section it is specifically provided that nothing in chapter 68 shall be construed "to affect or interfere in any way with the operation of any hospital now established in this State; or to any person while engaged in conducting such hospital now established, if there be a licensed practitioner resident or practicing therein; * * * ."

The able and learned judge of the trial court, in considering section 1618, concluded that hospitals were exempted from the provisions of chapter 68 to the extent of

rendering, through their internes, such skilled service as might be necessary in administering routine medical treatment as is customarily engaged in by hospitals in the treatment of their patients. He was likewise of the opinion that the exemption included such care and treatment as was rendered Mrs. Curry in the routine administration of the dye solution. The case proceeded to trial on that theory.

The exemption of hospitals from the prohibition that no one except a licensed physician may practice medicine must have some meaning. Its obvious purpose is to permit them to render a special service to the sick, weak and infirm, such a service as hospitals already established have been rendering. This cannot be done merely by the furnishing of suitable and comfortable rooms and food for the special necessities of the patient, but must include the trained care of nurses, and medical attention from qualified persons whenever required by the patient's condition. This is made clearer by the provision for a licensed practitioner resident or practicing in the hospital. The presence of such physician would be useless unless his professional skill and service were to be employed.

The peculiar nature of a corporation prevents it as such from practicing medicine, but there is no ban against the performance of duties by its qualified agents, servants and employees, which they are qualified to perform, and which they are held out by the hospital as being able to perform. The effect of the exemption in the statute is to authorize hospitals to render necessary routine medical care and attention to its patients such as is customarily engaged in by hospitals. So, while a hospital may not be licensed to practice medicine, within the intent of the broad statutory definition thereof, it may actually engage in so much of said practice as is customary and necessary in the proper conduct of its business, without being required to comply with the regulations provided for an individual.

The implied contract to render the services that the hospital undertook for Mrs. Curry was neither illegal nor *ultra vires*. It was an undertaking for compensation to

render her all necessary routine medical treatment and nursing services which her condition might require, while she was a patient in the hospital, through the hands of its agents, servants and employees, both of a skilled and unskilled nature.

The interne and the nurse were the servants of the hospital. They were chosen by the hospital and received their compensation from it. The length and extent of their service was supervised and controlled by their employer. Any negligent performance of their duties, whether by lack of professional equipment or lack of professional skill, constituted a breach of the contract made by their employer.

The object, aim and purpose of a hospital,—the reason for its establishment and operation, is to render and perform medical treatment and nursing of a skilled character. It is the facility for affording the patient a higher and greater degree of nursing and medical attention than would be ordinarily possible outside of a hospital that makes it desirable. The opportunity to render such service enables a hospital to make a higher charge than a hotel or boarding house. The desirability of securing the needed service provides inducement for the patient to enter the hospital. The patient comes to the hospital for advice, aid and treatment, —not to give either.

It is well to bear in mind that under the facts here, the defendant does not operate a charitable institution. The acts complained of are not those of a selected, attending physician, whether as a member of the staff of the hospital, or an outsider. The contract was not to furnish Mrs. Curry with a competent and skilled physician. The interne, such as the one employed here, held a different relationship to the hospital from a visiting physician or the members of its staff.

It is not, therefore, necessary to review here numerous cases cited by the defendant relating to the liability of public and charitable institutions. While all of the States apparently recognize immunity to some degree for such institutions from the result of negligence, the extent of the

immunity and the reason assigned therefor vary in the different jurisdictions. Some of the States have refused to apply the rule where negligence occurs in the performance of administrative acts, or where there has been a failure to use due care in the selection of professional employees.

In Virginia, in the case of *Weston's Adm'x* v. *Hospital of St. Vincent, etc.,* 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907, we held, on the ground of public policy, that a charitable hospital is not liable for injuries resulting from the negligence of a nurse employed by it where due care has been exercised in the selection and retention of the nurse. In that case, Judge Burks, in an able and exhaustive opinion, reviewed many authorities, and discussed in detail the grounds and reasoning for the exemption. *Norfolk Protestant Hospital* v. *Plunkett,* 162 Va. 151, 173 S. E. 363.

The question of liability for the negligent action of a nurse in the employ of a private hospital is answered in *Tucker Sanatorium, Inc.* v. *Cohen,* 129 Va. 576, 106 S. E. 355, 22 A. L. R. 315. The facts in that case are somewhat similar to those here. The Tucker Sanatorium was a private hospital operated for profit. There a nurse employed by it carelessly applied hot pads to the back of a patient, causing him severe burns and scalds. The hospital was held to be liable. The basis of the liability was the undertaking of the hospital to furnish competent hospitalization; and the fact that the patient, having entrusted himself to the hospital for treatment, had the right to expect from it and its employees, while under its care, ordinary care and skill in nursing and treatment in such a degree of diligence as the nature of his case required.

We need not, therefore, pursue this case further with reference to the negligence of the nurse, except to say that there was sufficient evidence, if believed, to justify the jury in finding that the nurse in charge of Mrs. Curry did not exercise ordinary and reasonable care in inspecting the hot water application after it had been applied to the patient's arm.

■ It is conceded that a hospital is not responsible for the acts of an attending physician, whether a member of its staff or an outsider, except where by contract it has assumed responsibility. This is based on the ground that such physician is an independent contractor and alone is responsible for the exercise of professional skill and judgment, subject to no control by the hospital in the execution thereof.

■ The instant case does not come within this principle. Here we have an alleged contract to render medical service and nursing. The interne is not an independent contractor so far as the patient is concerned. His contract is with the hospital. His service is a part of the numerous duties prescribed by the hospital, and he is selected, employed, directed, supervised, and paid by the hospital.

■ Both the interne and the nurse are specially and highly trained. Both belong to trained and skilled professions. Where both are employees of a hospital and work directly under its supervision and control, there is no substantial difference in their relationship to a patient in the hospital. Their duties and functions may vary, but all of their services to a patient are intended to secure and protect his welfare. In rendering such services they act on behalf of their employer.

In *Virginia Iron, etc., Co.* v. *Odle's Adm'r*, 128 Va. 280, 105 S. E. 107, Judge Burks, speaking for the court, said:

"Physicians, surgeons and medical hospitals operated for profit hold out to the world their capacity to furnish skillful medical and surgical treatment, and are liable for the malpractice and negligence of themselves and their employees, but a mining corporation is engaged in an entirely different business. Its officers and managers are not skilled in medicine and surgery, and if they employ a physician or surgeon, they cannot supervise the details of his work nor the manner of executing it. They have not the capacity to do so. The company may, for a consideration, enter into a contract with its employees absolutely to furnish medical attention at all times during their service. Such a contract is not *ultra vires* the powers of the corporation, and if entered

into the company is bound by it, and obliged to respond in damages for its breach. Where such is the contract the company is bound for the malpractice and negligence of a physician employed by it. But such a contract with a mining company must be proved, it will not be readily implied."

In the above case, an action was brought against the company and a physician employed by it to attend its employees on the ground that the doctor had negligently failed to render the necessary medical attention to a deceased employee, and that such negligence caused the employee's death. The facts showed that the company undertook to employ only a competent doctor, the latter to render medical treatment to its employees when called upon. The doctor so employed did not attend the sick employee when called upon because of the pressure of other professional duties, and the employee soon thereafter died without medical attention.

The court held that the undertaking of the company was merely to furnish a competent physician, and not to furnish medical services. The opinion, for the purpose of emphasizing the distinction, stated the principles of law applicable to the two different obligations. The reasoning for the distinction is both clear and sound.

In West Virginia, it is held that where a private hospital operated for profit, contracts and undertakes to perform medical or surgical duties beyond the scope of routine medical service, it is liable if the physicians and surgeons undertaking to render such duties are negligent in the performance thereof. If the hospital agrees and undertakes to perform such duties, it is denied the right to escape liability by claiming that the person selected by it to do the work is an independent contractor. *Jenkins* v. *Charleston General Hospital,* 90 W. Va. 230, 110 S. E. 560, 22 A. L. R. 323; *Vaughan* v. *Memorial Hospital* (1925), 100 W. Va. 290, 130 S. E. 481.

The same rule is applied in California, Missouri and Alabama in the following cases: *Brown* v. *La Societe Francaise,* 138 Cal. 475, 71 P. 516; *Gilstrap* v. *Osteopathic Sanatorium Company* (1929), 224 Mo. App. 798, 24 S. W.

(2d) 249; *Birmingham Baptist Hospital* v. *Branton*, 218 Ala. 464, 118 So. 741.

Florida and Nebraska courts hold that a hospital operated for profit is liable for the negligence of nurses and other employees while performing customary hospitalization services in its behalf. *Parrish* v. *Clark*, 107 Fla. 598, 145 So. 848; *Malcolm* v. *Evangelical Lutheran Hospital Association* (1921), 107 Neb. 101, 185 N. W. 330.

Cases from other States hold that a private hospital is not liable for negligence in the performance of medical duties beyond the scope of customary hospitalization. *Stacy* v. *Williams*, 253 Ky. 353, 69 S. W. (2d) 697; *Hoke* v. *Harrisburg Hospital, Inc.*, 281 Ill. App. 247; *Iterman* v. *Baker* (Ind. 1938), 15 N. E. (2d) 365.

The case of *Iterman* v. *Baker, supra,* strongly supports the contentions of the defendant. The Indiana statute, however, contained no such exemption as is found in the Virginia statutes relating to the practice of medicine. It is there held both that a contract of a corporation to practice medicine is void as being in violation of the laws of Indiana; and that a claim based upon a failure of the hospital to exercise professional skill and judgment must arise from a duty resulting from a contract expressed and implied to exercise such skill and judgment. The case is largely concerned with the nature and scope of the undertaking assumed by the corporation under the facts of that case.

It would serve no useful purpose to undertake to further discuss numerous other cases cited by able and learned counsel for both parties in their very able and exhaustive briefs. It is apparent that they have explored the whole field of the law and the many cases having a bearing upon not only the points involved here, but many other similar points.

In *Aronovitch* v. *Ayres* (1937), 169 Va. 308, 193 S. E. 524, where the weight to be given a jury's verdict as to damages was considered, the rule applicable for many years in Virginia is approved, and many cases involving verdicts for large sums are cited and reviewed.

 The verdict of the jury is for a large sum of money. The injuries of the plaintiff were grave and serious. Whether her physical and neurotic condition will improve, eminent physicians are unable to forecast. The jury were clearly and correctly instructed on the law and the proper elements of damage. There is nothing to indicate the presence of passion, prejudice, or improper emotions. As we have repeatedly said, there is no standard by which we can measure in dollars and cents the pain and suffering of an individual. Its measurement is peculiarly within the province of the jury. We cannot say that the award here is excessive.

 Upon principle and reason we are of opinion that a private hospital operated for profit and holding itself out to the public to furnish to its patients medical treatment, nursing service, and attention, is responsible to a patient for the negligent acts of internes and nurses, employed by it and acting under its supervision and control, in the performance of their routine duties.

The evidence is sufficient to justify the verdict of the jury. We find no error in the rulings of the trial court. The judgment is affirmed.

*Affirmed.*