Argued February 13, reversed July 29, 1959

# FERGISON, Admt'x *v.* BELMONT CONVA-
# LESCENT HOSPITAL, INC.

### 343 P. 2d 243

*Wayne A. Williamson*, Portland, argued the cause for appellant. With him on the brief were Mautz, Souther, Spaulding, Denecke & Kinsey and Douglas M. Thompson, Portland.

*William D. Campbell*, Portland, argued the cause for the respondent. With him on the brief were Freed & Failing and Paul D. Hanlon, Portland.

Before McALLISTER, Chief Justice, ROSSMAN, LUSK and WARNER, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Belmont Convalescent Hospital, Inc., from a judgment in the sum of $2,832.35 which the circuit court entered against it and in favor of the plaintiff, Fermine Fergison, administratrix of the estate of Mabel B. Paige, deceased. The judgment was based upon a verdict. Fermine Fergison was a daughter of the deceased. The defend-

ant is a non-eleemosynary corporation which operates a home for convalescents. The action was filed pursuant to ORS 30.020 which reads:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the decedent, for the benefit of * * * the estate of the decedent, may maintain an action against the wrongdoer, if the decedent might have maintained an action, had he lived, against the wrongdoer for an injury done by the same act or omission. * * * and damages therein * * * may include a recovery for all reasonable expenses paid or incurred for funeral, * * * doctor, hospital or nursing services for the deceased."

In her complaint the plaintiff alleged that the death of the decedent, Mabel B. Paige, was due to the negligence of the defendant and prayed for judgment in the amount of the funeral, doctor, hospital and nursing expenses which the estate had incurred.

July 27, 1953, when the deceased, Mabel B. Paige, was 82 years of age, she was admitted to the defendant's home. The complaint alleges:

"At the time decedent was admitted to said Home and at all times thereafter while she was a patient herein defendant knew that decedent's physical condition was such that she was likely to fall and injure herself if permitted to get out of her bed and walk about the darkened room at night unassisted, and knew that she was in the habit of getting up from her bed and going to the bathroom during each night.

"After having equipped and maintained decedent's bed with side-rails to prevent her from leaving her bed at night and walking about unassisted, defendant negligently and carelessly ceased to provide such side-rails, or any other safe-guard, and as a result of defendant's said negligence and carelessness decedent, during the night of August

5-6, 1953, while a patient at said Home, left her bed, and, while attempting to walk unassisted in the darkened room, fell and was fatally injured as hereinafter more particularly set forth."

The parties agree that Mrs. Paige fell to the floor of her room in the defendant's convalescent hospital. The hour evidently was 12:30 a.m. of August 6, 1953. The evidence indicates that at about that time she suffered a paralytic stroke, that is, a cerebral hemorrhage. No one saw Mrs. Paige fall nor the incidents preceding the fall, but she was lying upon the floor when attendants in the defendant's employ, who had heard her call for help, came to her.

Although the averment which we quoted from the complaint says that Mrs. Paige was "fatally injured" in a fall August 6, 1953, her death did not occur until June 28, 1954,—10 months and 22 days after August 6, 1953. It will be recalled that she was admitted to the defendant's convalescent hospital July 27, 1953,—11 days before the fall. Doctor Bruce A. Boyd, the physician who attended Mrs. Paige during her final two weeks of life wrote in the part of her death certificate which called for "diseases or condition directly leading to death" "Cardiac Failure" and as a witness explained that the term means heart failure. In another space of the death certificate entitled "antecedent causes" he wrote, "Hypertensive & Arteriosclerotic Cardiovasc. Dis." In a third space which asked for other significant conditions he entered "Cerebral Arteriosclerosis."

The plaintiff contends that the brain hemorrhage which Mrs. Paige suffered August 6, 1953, came upon her in one of the following ways: (1) through the physical efforts she made in getting out of her bed, (2) through anxiety, which the plaintiff says Mrs. Paige experienced after she got out of bed and found

herself standing in a darkened room or (3) in falling to the floor. The plaintiff presented evidence of which we will take greater notice later that fear, excitement, a fall or physical exertion can produce a brain hemorrhage in a person whose physical condition had deteriorated to the extent of Mrs. Paige's. She argues that it was the duty of the defendant to have maintained bed rails upon Mrs. Paige's bed, and that if it had not neglected that alleged duty the brain hemorrhage and the eventual death would not have occurred.

The medical expenses for which recovery was sought, $2,832.35, were incurred, according to the plaintiff, as a result of the paralytic stroke sustained August 6, 1953. After Mrs. Paige's death this action, which we have said is based upon ORS 30.020, was instituted. It sought the recovery of not only the medical expenditures but also of $1,080.40 funeral expenses. The verdict, however, was in the sum of $2,832.35, the exact amount of the medical expenses (doctor, hospital and nursing).

The defendant submits only one assignment of error. It reads:

"The Court erred in failing to allow defendant's motions for judgment of involuntary non-suit and for directed verdict, which said motions are as follows * * *."

Both motions were based upon the following grounds: (1) Although two daughters of Mrs. Paige who brought her to the defendant's convalescent hospital requested the defendant to provide her bed with side-rails so as to prevent her from leaving the bed, the evidence fails to indicate that the defendant owed Mrs. Paige, who was mentally alert and who asked that the rails be removed, a duty to maintain them so as to

prevent her from leaving her bed; (2) The record does not indicate that the lack of rails on the night of August 6 was a proximate cause of Mrs. Paige's injury, either by causing her to fall or by causing her to suffer a stroke; (3) The record fails to indicate that Mrs. Paige's death, virtually eleven months after the unfortunate incidents that occurred August 6 was the result of the latter unless speculation and conjecture are accepted as substitutes for evidence; and (4) The evidence fails to show the amount of the medical expenses which Mrs. Paige would have incurred in any event, and it was therefore error for the circuit court to award the plaintiff recovery for all medical expenses that were incurred after August 6.

The following is a brief statement of the facts disclosed by the evidence. It is set forth in the version most favorable to the plaintiff.

Mrs. Paige was 82 years of age when she entered the defendant's convalescent hospital. She had poor eyesight and suffered from hypertension, generalized arteriosclerosis and a kidney involvement. About five months earlier she had been the victim of a stroke of paralysis from which she had virtually recovered but it left her with a predisposition to another. In walking she had to steady herself with a cane or by holding on to a companion. But on the whole, she was in generally good health provided her advanced years were borne in mind. All of the witnesses who were questioned upon the subject described Mrs. Paige as alert mentally and a good conversationalist. She dressed herself, combed her hair and needed no help in feeding herself. During the day she sat in a chair. With help she walked down the corridor of the convalescent hospital.

When Mrs. Paige had her stroke in California she

stayed in a rest home. Prior to the stroke she had lived with one of her daughters in California.

July 27, 1953, Mrs. Paige was brought to Portland when the daughter in California had become ill. She came to Portland because Mrs. Fergison lived there. When she entered the defendant's convalescent hospital Mrs. Fergison and the daughter who brought her to Portland informed the defendant's manager that the mother had a habit of going to a bathroom several times at night and that unless restrained from so doing by bed rails they feared she might sustain injury by falling in the darkness. They requested that side-rails be installed upon her bed and displayed a letter written by a nurse in the California rest home which stated that Mrs. Paige's bed there had bed rails. In the presence of the daughters defendant's manager installed side-rails upon one side of Mrs. Paige's bed. They ran the length of the bed and extended 14 inches above the mattress. The bed was so placed that the side thus equipped faced the room. The side without rails was placed against the wall. The rails could not be lowered by any one in the bed.

Four days after Mrs. Paige's admission to the defendant's convalescent hospital she was transferred to another room and the bed was again so placed that the side with rails faced the room. Two days later, when it developed that the sun shone into Mrs. Paige's eyes, the position of her bed was reversed and thereupon the side with rails faced the wall and, accordingly, she was not prevented by any rails from leaving her bed. For the next four days and until her fall on August 6 the side of her bed which faced the room was without rails.

The only testimony as to what transpired on the night of the accident, August 6, was given by Mrs.

Mary Frances Taylor, a practical nurse who was employed in the defendant's hospital and who until two days before Mrs. Paige's injury took care of her. Mrs. Taylor was called to the witness stand by the plaintiff. According to her testimony, Mrs. Paige did not go to the bathroom at night, but when she needed attention rang a bell at the side of her bed and thereupon Mrs. Taylor responded. That course of events occurred from two to four times each night.

On the night of August 6 Mrs. Taylor and two other practical nurses were on duty. While Mrs. Taylor was in the hall a few feet from Mrs. Paige's room and the other two nurses were only a little further away Mrs. Taylor heard Mrs. Paige call: "Help me. I am going to the bathroom." And then came the sound of a fall. She had heard no sound made by Mrs. Paige's bell. All three of the nurses immediately went to Mrs. Paige's room and found her lying on the floor about eight steps from her bed; her feet extended into the hallway. A laceration was over the left eye of Mrs. Paige, and extending from the cheek bone to the temple the nurses observed a bruise. In falling she had apparently struck a projection on a radiator. Doctor Walter Miller, a physician whom the daughters employed examined Mrs. Paige a few hours after the fall and testified that she had suffered a cerebral hemorrhage, that is, a stroke.

After the fall Mrs. Paige's condition was changed materially. She became incoherent, bedridden and quite helpless. From that time until her death, virtually eleven months later, she never recovered the ability to speak coherently. She remained at the defendant's convalescent hospital from August 6, the night of her fall, until the following February when she was taken to the home of her daughter, Mrs. Fergison. In April

Doctor Miller noticed that liquid was beginning to accumulate in Mrs. Paige's tissues, more especially in the lungs and around the heart. He termed the condition edema and said it was caused by her lying immobile in bed. According to him, the liquid unduly taxed the heart and when the latter could not create sufficient circulation to eliminate the liquid an additional burden was placed upon the heart which caused it to deteriorate. In the early part of June Mrs. Paige went into a coma and was then taken to a hospital where she briefly rallied, but death overtook her June 28, 1954.

Before the adoption of Oregon Laws 1953, chapter 600, which amended our wrongful death act, ORS 30.020, this action for the recovery of medical and burial expenditures by the decedent's estate if in tort could not have been maintained. The purpose of ORS 30.020 is to afford redress in wrongful death cases where no redress was obtainable at common law. *Cowgill, Adm'r. v. Boock, Adm'r.*, 189 Or 282, 218 P2d 445. That being true, the challenged judgment can be affirmed only if the evidence brings this case within the terms of ORS 30.020. The latter is not a survival statute in the sense that it preserves a cause of action which the deceased possessed; but, for this case to succeed it is essential that the evidence show that the defendant owed a duty to Mrs. Paige which the latter could have enforced. Of course, the plaintiff must also show that the defendant breached the purported duty and that it thereby caused Mrs. Paige's death. The duty which the plaintiff says the defendant owed to Mrs. Paige was the maintenance of side-rails. Therefore, the plaintiff must prove that Mrs. Paige herself could have enforced that purported duty or could have maintained an action for its disregard. We must bear

in mind that the plaintiff in this case is not Mrs. Fergison, the daughter, but the estate of Mrs. Paige, the deceased.

It is necessary to determine the nature and extent of the duty which the plaintiff says the defendant owed to Mrs. Paige. We have mentioned the fact that two of Mrs. Paige's daughters testified that they requested the defendant, when Mrs. Paige entered the defendant's convalescent hospital, to equip her bed with side-rails and that they voiced fears that unless that safety measure were employed the mother might leave her bed and meet with injury. The defendant thereupon, in the presence of the daughters, installed bed rails upon the room side of the bed and maintained them there at night until four days before the unfortunate events of August 6, 1953, occurred. The plaintiff does not contend that Mrs. Paige requested the bed rails or objected when, four days before she fell to the floor, the rails were turned against the wall. Possibly it could be said, if Mrs. Paige was present when the daughters requested the installation of the side-rails, that Mrs. Paige acquiesced in the request, but the evidence fails to disclose that she was present or knew of the request. That state of the evidence together with the fact that the complaint does not allege the existence of a contractual duty to maintain the side-rails makes it impossible to draw an inference of acquiescence. If when the side-rails were turned against the wall Mrs. Paige made a complaint to the defendant or to Mrs. Fergison that rails no longer prevented her from leaving her bed, no one mentioned that fact.

If the daughters made a contract for the benefit of Mrs. Paige requiring the installation of bed rails Mrs. Paige could clearly have objected to a breach of the duty when the rails were turned against the wall. Her

omission to have objected at that time would have been deemed a circumstance adverse to any claim upon her part, if she were the plaintiff, that a contract had been made for her benefit. The only testimony on the subject is that Mrs. Paige requested the defendant to remove the bed rails, but, as we have said, the jury did not accept that evidence. However, the plaintiff testified that the defendant never refused to perform any service that was requested of it for the mother. It would therefore seem logical to conclude that if Mrs. Paige did not ask to have the bed rails removed she nevertheless took no steps to see that any were installed upon the side of the bed which faced the room after the bed's position had been reversed. The record contains testimony, by a witness other than the one who claimed that Mrs. Paige asked to have the rails removed, that she objected to the presence of the rails. We can not, therefore, see how Mrs. Paige, had she continued to live, could have based a claim of liability upon a contractual duty to maintain the rails. But we will not rest our disposition of the case upon that ground. However, those facts indicate that the cause of action which the plaintiff seeks to maintain is not predicated upon any contract theory.

■ Although the complaint alleges that "for valuable consideration the defendant undertook to furnish decedent with such board, room and care," it does not allege that the defendant undertook to maintain bed rails. In the paragraphs of the complaint which are quoted near the opening of this opinion the complaint avers that after the defendant had equipped Mrs. Paige's bed "with side-rails to prevent her from leaving her bed at night and walking about unassisted, defendant negligently and carelessly ceased to provide such side-rails." It then continues: "said negligence

and carelessness of defendant was the sole and proximate cause of decedent's injuries." We are satisfied that we must treat this as a tort action. *Harper v. Interstate Brewery Co.*, 168 Or 26, 120 P2d 757, holds that whenever a relationship is created by a contract, and the general law "independent of the terms of the contract" predicates the duty arising out of the relationship, the parties are not necessarily confined to an action ex contractu when the duty is violated. The decision declared, "If from the position, contractually assumed, a duty be raised independent of the contract an action in tort may lie."

In proceeding we must view this action as though Mrs. Paige were herself charging the defendant with a duty to maintain for her safety the side-rails and, accordingly, we must determine whether the evidence previously reviewed establishes that duty. See *Apitz v. Dames*, 205 Or 242, 287 P2d 585. Since the defendant charges for the services which it renders to its patients, Mrs. Paige probably would not have been received in defendant's convalescent hospital unless the preliminary discussions effected an agreement for her entry. Accordingly, we may deem the contract as having created between the defendant and Mrs. Paige the relationship of hospital and patient in the manner in which relationships of an analogous character are treated in *Harper v. Interstate Brewery Co.*, supra. Mutual duties arose when the relationship was brought into being and we now face the issue as to the extent of the duty which a private hospital such as the defendant's owes to a patient such as Mrs. Paige. The general rule is thus stated in 41 CJS, Hospitals, § 8c (3), page 349:

> "The extent and character of the care that a hospital owes its patients depends on the circum-

stances of each particular case. A private hospital owes its patients the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require. The measure of duty of a hospital is to exercise that degree of care, skill, and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking. A hospital is liable for want of ordinary care, whether from incompetency of a nurse or failure in duty by a fully qualified nurse. The duty of a hospital toward one for whom it undertakes to care cannot, by agreement with a third person, be reduced below that which the law generally exacts. The duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity, and to the use of any instrumentality producing pain. On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen."

The following is taken from 26 Am Jur, Hospitals and Asylums, § 14:

"The degree of care exacted of private institutions toward their patients is such reasonable care and attention for their safety as their mental and physical condition, if known, may require, and should be in proportion to the physical or mental ailments of the patient, rendering him unable to look after his own safety. * * *"

It will be noticed that the text quoted from CJS indicates that in tort actions the duty of a hospital may be set forth in the terms of an "express or implied contract." A preceding paragraph of this opinion takes note of the holding in *Harper v. Interstate Brewery Co.*, supra, upon that subject.

The term "required by the express or implied contract of the undertaking" as employed in the quotation which we took from CJS may have pertinence only to the distinction drawn by some courts between the liability of a charitable hospital and a private hospital. Hayt, Law of Hospital, Physician and Patient, 2nd Ed., chap. 18. This would seem unlikely in view of the fact that the phrase is used in 41 CJS in a section on private hospitals. It seems more likely that it has reference in the typical case to the creation of a relationship as indicated in *Harper v. Interstate Brewery Co.*, supra. That decision, in addition to the passages which we took from it, said "Relationships of * * * physician and patient, and attorney and client each originate in contract, express or implied; yet for a breach of duties imposed by general law upon persons assuming such relationship an action of tort may lie."

In *Mahoney v. Harley Private Hospital, Inc.*, 279 Mass 96, 180 NE 723, the court pointed out that the duty to use due care toward an infant arose not only out of the contract with the mother, but was inherent in the assumption of control by the defendant as well. Florida is a state which recognizes the contract aspects of the problem. In *Parrish v. Clark*, 107 Fla 598, 145 So 848, where a nurse was negligent in giving an injection, the court held that the declaration sounded in either tort or contract; it stated:

"* * * in cases like this an action may arise for the breach of the contract, or for the positive tort committed by the violation of a duty arising out of the assumption of the contractual relation. * * *"

See to like effect *City of Miami v. Williams*, (Fla, 1949) 40 So2d 205. In *Holbrook v. City of Sarasota*, (Fla, 1952) 58 So2d 862, the alleged breach of contract consisted of unskillful care which permitted a patient to

fall from her bed while she lacked full control of her faculties. There was no allegation of a special promise; nevertheless the action was sustained on the theory that it was in contract and therefore did not require the giving of the statutory notice to the city which was a requirement in tort actions.

*Roche v. St. John's Riverside Hospital*, 96 Misc 289, 160 NYS 401, held that a wrongful death action against a hospital could be brought on either a contract or tort theory under a statute similar to ours. The court made the following comments:

"* * * The fair intendment of the allegations of this cause of action is to allege a contract to receive the infant and exercise over it careful supervision and watchfulness in order that it might not suffer harm. It may be urged that this was no more than the measure of the defendant's legal duties to the infant, and it is true that, having received the infant under its care, its legal duty and the duty under its contract were coincident. One who receives an infant of tender years under his charge, either gratuitously or otherwise, owes him the legal duty of due care to prevent injury to him; but the defendant was not bound to receive him and did not receive him gratuitously. Its contract, based on a valuable consideration, was to receive him and give him the care which his tender age required. Until it received him under this contract, it owed him no legal duty. It would seem reasonably plain, therefore, that there could be no breach of its legal duty, except by breach of its express contract, and it seems to me, therefore, that the acts complained of constituted a breach of an express contract. * * *"

The cases indicate that the contract coverage may be extended to include a promise to furnish certain types of care. For example, in *Garfield Memorial Hospital v. Marshall*, 204 F2d 721 (C A D C) the contract bound the hospital to furnish a physician, and it was

therefore liable for the negligence of the physician which it supplied. *Stuart Circle Hospital Corporation v. Curry*, 173 Va 136, 3 SE2d 153, 124 ALR 176, held that where the implied contract of the hospital includes a promise to render routine medical care, the hospital is liable for the negligence of one of its interns. *Gooch v. Buford*, 262 F 894, held that there was no cause of action in tort for failure to have a special nurse for a mentally incompetent patient, but that a cause of action in contract was available in such an instance. In *Gray v. Carter*, 100 Cal App2d 642, 224 P2d 28, the fact that the defendant had done no more than promise to provide regular nursing care to an aged patient, that is, had not contracted to furnish special nursing care at all times, was mentioned as one of the grounds for refusing to allow a recovery. In *Ward v. St. Vincent's Hospital*, 39 App Div 624, 57 NYS 784, reversing 23 Misc 91, 50 NYS 466, it was held to be a breach of a contract to furnish a competent nurse when the patient was injured by the negligence of an untrained nurse. The contract issue was important, as the duty of the charitable hospital in that case was not to use due care in treatment, but only in the selection of nurses. As put by the court:

"In the present case, the contract was express. It settled all questions of general duty attached by law, and became the criterion of the defendant's specific duty in this particular case. * * * For the breech, then, of that express specific and valid contract, the plaintiff was entitled to the same damages as though the action had been for negligence pure and simple. In either case she was entitled to compensation, that is, to an adequate indemnity for her injuries, no more and no less."

The only decision which we have discovered that discusses to any extent the rule with respect to the

standard of care which is required is *South Highlands Infirmary v. Galloway*, 233 Ala 276, 171 So 250, but since no express contract was involved in the case the court's utterances upon the subject are dicta. There a 78 year old patient fell from his bed shortly after an operation and fractured his thigh. The issue was the negligence of the hospital in leaving him unattended. The court said:

> "* * * It is not to be construed as imposing a greater 'degree of care, skill, and diligence' than that 'used by hospitals generally in that community,' unless there is some evidence of an express or implied contract imposing a higher obligation than that implied from the admission of a pay patient on the customary basis. * * *"

Since the parties had entered into no express contract, the court held that it was the duty of the jury to determine whether the plaintiff had recovered sufficiently from the operation to make it reasonable to leave him alone.

A large number of cases have involved the duty of hospitals in applying restraints to patients to prevent them from hurting themselves. Throughout virtually all of them runs the issue of the capacity of the patient to take care of himself, as would seem reasonable from the quotations we made from the texts which refer to the element of the "known" condition of the patient. While *Maki v. Murray Hospital*, 91 Mont 251, 7 P2d 228, suggests that this should be read as "known or should have known," *Mesedahl v. St. Luke's Hospital Association*, 194 Minn 198, 259 NW 819, points out that a general hospital has no duty to inquire into the mental state of a patient in the manner that would be expected of a mental hospital, and therefore is liable only if the circumstances, called to its attention, require

a certain duty of care. Thus, the function of an express promise in attaching liability may be no more than to serve the purpose of giving notice to the hospital that the patient's condition requires a certain duty of care or, in our context, requires a certain degree of restraint. For example, *Memorial Hospital v. Doring*, (Fla, 1958) 106 So2d 565, held that a physician's order of "absolute bed rest" for a patient who had a broken shoulder and who was later found walking in his room in an effort to reach the bathroom, was not sufficient to charge the hospital with notice that the patient should be watched so that he would not leave his bed. The court also held that the omission to supply bed rails was not negligence since the patient, contrary to the averments, was not in a helpless state, mentally or physicially.

We have found only two decisions in which recovery was allowed to a patient who was mentally alert and whose voluntary act was the cause of his injury. We will take note of them shortly. Some cases proceed on the theory that the "known" condition of the patient does or does not give rise to a duty. Others proceed on the theory that the proximate cause of the injury is the act of the alert patient. Some adopt a theory of contributory negligence and some rest on more than one of these grounds. Conversely, the cases require a showing of incapacity in some form before recovery is granted. We shall now review some of these decisions.

Georgia has rendered a number of decisions in recent years concerning the duty of a hospital to a patient whose condition was known. *Stansfield v. Gardner*, 56 Ga App 634, 193 SE 375, holds that the acquiescence of a father in less continuous supervision of his mentally incompetent son estops him, as well as his son, from complaining of any injury due to lack of supervision unless such protection is generally re-

quired by the law itself, that is, by a general duty of due care. The cases, however, that are more in point upon the phase of the problem under consideration begin with *Adams v. Ricks*, 91 Ga App 494, 86 SE2d 329. There a complaint alleging that the plaintiff fell out of bed while in a semi-conscious state was held to state a cause of action when it alleged (1) a lack of bed rails, (2) leaving the patient alone and (3) failure to provide the patient with a call bell. The defense that his own negligence was the proximate cause of his injury was rejected because it had been alleged that he was semi-conscious. That decision was followed by *Wills v. Emory University*, 94 Ga App 734, 96 SE2d 220, where a patient recovering from pneumonia fell out of bed. It was alleged that she was semi-conscious and that her fall was due to a lack of bed rails, a lack of a nurse and a failure to secure her in bed. In disposing of the case the court found that initially she was semi-conscious and that bed rails had been attached to her bed. Going on, the court declared:

"Her pneumonia responded rapidly to treatment with antibiotics and on the night she fell from her bed she was mentally alert, conversed with her husband, and gave no indication that she would or could leave her bed. Consequently, the evidence not only authorized, but demanded the verdict for the defendant * * *."

The question finally came before the supreme court in *Executive Committee of the Baptist Convention v. Ferguson*, 213 Ga 441, 99 SE2d 150, affirming on this ground *Executive Committee of the Baptist Convention v. Ferguson*, 95 Ga App 393, 98 SE2d 50. There a 70 year old patient fell out of bed. The court stated that since she was nervous the Wills case, supra, required a directed verdict for the defendant, but that there

were additional circumstances. The daughter of the plaintiff had told the physician that the plaintiff should have side-rails and there was testimony that the physician ordered the hospital to install them. The court said that if that evidence was true it became the duty of the hospital to erect rails for whatever purpose the doctor ordered. However, the plaintiff testified that she fell from the bed while asleep, despite the fact that several other witnesses testified that she told them that she fell when she got out of bed to go to a bathroom; and the court felt that this was enough evidence to go to the jury. It thus implied that if the testimony of the latter witnesses was true there could be no recovery but that it could not say, in light of her statements, that there was not enough evidence to support a verdict for the plaintiff. It must be noted that there was an express duty to provide rails, and yet the court went on to inquire into the condition of the plaintiff at the time of the accident. That is, was it the combination of the lack of bed rails and unconscious acts of the plaintiff which combined to cause the injury or was it the voluntary act of a mentally alert patient which caused it? On the authority of that decision *Hospital Authority of Hall County v. Shubert*, 96 Ga App 222, 99 SE2d 708, held that an allegation that an 83 year old patient fell out of a bed without side-rails when she was in a weakened physical and mental condition and semi-conscious stated a cause of action. Finally, in *Emory University v. Lee*, 97 Ga App 680, 104 SE2d 234, recovery was allowed when an intern let down the side-rails of the bed of a semi-violent and irrational patient who then fell from a window. The contention that he knew what he was doing was not held to be supported but, on the contrary, the court felt that there was enough to show that he was in such a mental state

that he was incapable of making any decision or controlling himself.

The case of *Potter v. Dr. W. H. Groves Latter-Day Saints Hospital*, 99 Utah 71, 103 P3d 280, cited by the defendant is in point. There recovery by a beneficiary for the death of the decedent caused by falling out of bed was denied. Side-rails had been placed on the decedent's bed at one time when she was "very restless and nervous and even irrational at times." However, by the time of the accident she was "much quieter and less restless." A nurse had talked with her shortly before the accident, and when she heard loud talking returned to the patient's room to find her sitting on the edge of the bed preparing to get up. The case was one of those decided on multiple grounds, the court holding that there was no duty to one in a quiet condition, but it went further and made this comment:

> "But appellant's defense is even stronger. Even if it be conceded that sideboards would have prevented Mrs. Potter from involuntarily rolling from her bed, in the record is positive and uncontradicted testimony that she (Mrs. Potter) was making a conscious and voluntary effort to get from her bed when she 'fell.' Miss Felix had found her to be rational and quiet 5 minutes before, and at the very time of her 'fall' Mrs. Potter was talking with Mrs. Kearney and was getting from her bed over Mrs. Kearney's protest. Mrs. Potter did not 'fall' in the sense that she involuntarily rolled from her bed; she was consciously trying to leave her bed to 'go to the bathroom.' The conclusion seems inescapable that Mrs. Potter's 'fall' and injury resulted from her own voluntary and conscious action, and not from any negligent act or omission to act by appellant. * * *"

In *Cochran v. Harrison Memorial Hospital*, 42 Wash2d 264, 254 P2d 752, the plaintiff fell off her bed

while sitting on its edge and reaching for a basin as a nurse had told her to do. Relief was denied on the basis that no duty was shown to provide bed rails for a patient in the plaintiff's mentally alert condition. There, as here, there was no evidence of the practice of hospitals in the community, but only the testimony of a doctor that rails might be good while the plaintiff was asleep. Since she was awake at the time of the accident, this was held to have no application.

In *Kletrovetz v. Grant Hospital*, 105 Ohio App 236, 152 NE2d 149, recovery was denied despite the fact that the patient had had a hypnotic injection. The court said that it could not say that the lack of bed rails was or was not the cause of the fall because the patient had gotten up and walked around, got back into bed, "blacked-out" while trying to get up again, and then was later found on the floor. Apparently the court considered that the possibility the plaintiff had been walking when he fell meant that the accident may have been caused by his voluntary act of getting up and walking and, therefore, the jury should not be allowed to speculate that it happened otherwise.

As previously noted, *Memorial Hospital v. Doring*, supra, held that there was no duty to provide bed rails for a mentally alert patient. *Marsh v. City of St. Petersburg*, (Fla, 1958) 106 So2d 567, was a companion case to Doring and, on its authority, denied recovery to a 70 year old plaintiff who fell out of bed while trying to get up to get a nurse after ringing her call bell for some time without success. The reasoning of the case was apparently that there was no duty owed to the plaintiff to install side-rails since she was competent.

To be contrasted with the Marsh case is the Virginia case of *Jefferson Hospital, Inc. v. Van Lear*, 186 Va 74, 41 SE2d 441. This is one of the two cases which we

have found which allowed recovery to a mentally alert patient, but this was done on the basis that his act in getting up to go to the bathroom was caused by the failure of the defendant to answer his summons for a bedpan. Since it seems important to us on the question of proximate cause, we will review it in detail. The question of a duty of care rested on the Am Jur statement which we have quoted. The court held that since the employees knew that the 75 year old plaintiff who had poor eyesight should not get out of bed and wait on himself as he had previously done it could be found negligent in not answering the bell more promptly. The court then continued:

> "The troublesome question presented to us, and that most seriously pressed, is whether the negligence of the hospital in failing to heed Mr. Van Lear's call and in failing to attend to his needs was the remote cause, and his own act in getting out of bed and attempting to minister to himself was the direct and proximate cause of his fall and consequent injuries.

> "A widely approved definition of proximate cause is, 'that cause, which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.' * * *

> "A cause of an injury may be the proximate cause notwithstanding it acted through a series of events, if the events were combined in one continuous chain through which the force of the cause operated to produce the disaster. * * *

> "As was said in *Milwaukee, etc., R. Co. v. Kellogg*, 94 U. S. 469, 474, 476, 24 L. Ed. 256: '* * * The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may

be moved by a force applied to the other end, that force being the proximate cause of the movement * * *.

\* \* \*

" 'The general rule is that whoever acts negligently is answerable for all the consequences that may ensue in the ordinary course of events, even though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer.' 38 Am. Jur., Negligence, sec. 69, p. 726. * * *

"In other words, an intervening cause does not operate to exempt a defendant from liability if that cause is put into operation by the defendant's wrongful act or omission.

"The principle is thus expressed in Restatement of the Law of Torts, Vol. 2, sec. 443, p. 1189: 'An intervening act of a human being or animal which is a normal response to the stimulus of a situation created by the actor's negligent conduct, is not a superseding cause of harm to another which the actor's conduct is a substantial factor in bringing about.'

"Tested by these principles we think the jury was fully warranted in finding that Mr. Van Lear's action in attempting to attend to his needs, under the circumstances, was not a superseding cause of his injury, but was merely a circumstance in a continuous sequence of events—that is, a connecting link between the negligence of the hospital and his injury. The intervening act of Mr. Van Lear was put into operation by the hospital's wrongful act or omission. His act was a 'normal response to the stimulus' of the situation created by the hospital's negligent conduct. * * *

\* \* \*

"In the case before us Mr. Van Lear's conduct was involuntary. He was driven by pain and natural impulse to get relief by waiting upon himself. His situation was akin to that in which a person, put

in peril by the negligent act of another, and in the instinctive effort to escape therefrom suffers injury. In this latter situation the negligent act is deemed the proximate cause of the injury. * * *"

The court also held proper an instruction on contributory negligence, stating that:

"* * * The urgency of the situation in which Mr. Van Lear was placed was a very material circumstance in determining whether he acted as a reasonably prudent man. For one in his physicial condition, recuperating from an operation, with impaired eyesight, to get up out of bed, unattended, to satisfy a trivial want, is quite different from doing so to answer an urgent call of nature. * * *"

The case was thus considered in three aspects, all of which pertain to the condition of the plaintiff, that is, duty, proximate cause and contributory negligence. The decision must rest ultimately upon the effect of a voluntary act.

Similarly, in *Belisle v. Wilson*, —— Mo ——, 313 SW3d 11, where a 60 year old alert patient fell out of bed while trying to get up and go to a bathroom, the only charge of negligence upheld was one alleging negligence in failing to provide a call button. An assertion that the employees "failed to watch and care for her" was not enough where there was no showing that she was physically unable to care for herself. Thus, as in the Van Lear case, the court must have considered that the failure of the defendant was the cause of her actions.

In *Gray v. Carter*, supra, recovery was denied to a 75 year old arthritis patient who fell in her room while still dressed. The plaintiff contended that she fell while getting into bed and that the defendant owed her a duty to help her do so. In addition to the fact that there was no evidence of how the fall occurred, the court

pointed out that there was no showing of a poor mental condition.

In *Johnson v. Mudbaden Sulphur Springs Co.*, 182 Minn 476, 234 NW 680, the plaintiff claimed that he fell and hurt his knee while getting out of a tub of hot water. He alleged negligence in the failure of the attendant to have helped him, as had been the past practice. While holding that the attendant was not negligent since he "could not reasonably anticipate that plaintiff would step out unaided unless plaintiff knew that he could do so safely." The court continued:

> "* * * Both knew that these baths were weakening, both knew that plaintiff had a bad knee; but plaintiff certainly knew better than Zarth whether he could safely place his weight on his right leg. If we assume Zarth to have been negligent in announcing to plaintiff that it was time to come out of the tub before being right there to lift him out, it certainly was equally a negligent act for plaintiff to attempt to get out before Zarth was there; and so there could be no recovery. * * *"

Among other cases which allowed recovery, where the patient fell or jumped because of an omission to restrain him, are: *Morningside Hospital & Training School for Nurses v. Pennington*, 189 Okla 170, 114 P2d 943, (irrational patient fell out of bed); *Lexington Hospital v. White*, 245 SW2d 927 (Kentucky), (mental patient jumped out of window); *Ford v. Vanderbilt University*, 40 Tenn App 87, 289 SW2d 210, (patient who was irrational from drugs fell out of bed; the court considered the height of the bed, the hardness of the floor and an inoperative call bell as well as the absence of bed rails); *Spivey v. St. Thomas Hospital*, 31 Tenn App 12, 211 SW2d 450, (patient delirious with fever broke loose from straps, climbed over side boards and

fell out of window) ; *Carlburg v. Wesley Hospital and Nurse Training School,* 182 Kan 634, 323 P2d 638, (semi-conscious patient fell out of bed while still under the influence of an anesthetic) ; and *Baptist Memorial Hospital v. Marrable,* 244 SW2d 567 (Tex Civ App), (semi-conscious patient fell out of bed after his wife requested the nurse to install side boards and she did not do so).

In the present case there was no direct evidence of the care exercised by similar institutions in the defendant's community concerning bed rails, unless we consider the testimony of one of the witnesses that rails were usually used for sleeping or confused patients and the evidence that the California rest home used rails for Mrs. Paige. But when she entered that home she was incapable of looking after herself. Although there is the testimony that Mrs. Paige's two daughters requested the defendant to install side-rails, other evidence seems to indicate that the decedent acquiesced in the absence of the rails. This is the case of a patient who was mentally alert. There is no claim that she rolled out of bed while asleep and likewise no contention that the purpose of the rails was to protect her while she slept. If it were conceded that there was some sort of a duty on the defendant's part to maintain the rails any breach of that duty could be a basis of recovery only if the breach was the proximate cause of Mrs. Paige's death.

The defendant has apparently failed to comprehend that the contention of the plaintiff is not necessarily that the fall itself produced the stroke, which we agree is not shown by the evidence to the necessary degree of probability, but that she also contends that the circumstances of what happened that night, basically, the getting out of bed unassisted, was what caused

the stroke, and that the stroke may have been either the cause or the effect of the fall. In any event, the stroke is traceable, so the plaintiff argues, to the alleged negligence of the defendant in failing to prevent Mrs. Paige from arising. We think, however, that the mere statement of the plaintiff's position discloses the fallacy in her argument. As we have seen, the ruling of the trial court must stand or fall on the question of whether Mrs. Paige could recover if she herself were suing. The reason for her stroke was that the decedent, who was mentally alert, and had done the same thing previously while she was admittedly mentally alert, voluntarily got out of bed to go to the bathroom. While the failure to have bed rails on her bed that night was a cause in fact of her injury, in the sense that under the plaintiff's theory the injury would not have occurred if she had been forced to remain in bed, we do not see how it can be denominated the proximate cause of her injury.

■ The plaintiff has attempted to bring herself in line with the cases granting recovery to a mentally incompetent patient by arguing that in one case the urge to get out of bed is due to a mental quirk and that in this case the urge was due to nature, and that the source of the urge is immaterial. This is not, of course, the point of such cases. Rather, they are based on the idea that the patient is not responsible for his actions. This is obviously the basis of *Jefferson Hospital v. Van Lear*, supra, with the twist that there, the very irresponsibility which prevents the patient from exercising a free choice is the result of the hospital's negligence in a positive sense. Here the absence of bed rails had only the negative function of permitting the decedent to get out of bed if she chose to do so. The plaintiff has also argued in her brief that the phrase "any

safeguards" in her complaint encompasses the failure of the nurses to take care promptly of Mrs. Paige's needs with a bedpan. If this were proven, it would, of course, by close analogy to the Van Lear case, permit recovery. There is no sound basis in this record for such an inference, however. The only testimony is that a nearby nurse did not hear a bell. The other nurses were involved in some complicated function requiring all of their attention. Mrs. Paige always used a bedpan at night while in the defendant's convalescent hospital and apparently had always been supplied with one promptly. The fact that the defendant did not call the other nurses to testify and the resulting purported presumption that they would have testified adversely to it does not help the plaintiff when there is no showing that those potential witnesses were not also available to her or in the absence of anything for the defendant to contradict. Only the plaintiff's witness testified as to the events of that night, and *Hope v. Stoner*, 108 Or 592, 218 P 555, holds that a party vouches for the credibility of his witnesses and must take the consequences of a fair construction of that testimony. We do not see how a witness's statement that she did not hear a bell can be given a construction that a bell was rung.

If a contention should be made that the decedent was rendered irrational by her impending stroke and therefore was not responsible for her actions, this would not help the plaintiff because, besides being based entirely on speculation, it would assume that the beginning of the stroke was antecedent to her getting out of bed, in which case the absence of rails would not even be a cause in fact of the injury.

■ While phrased in terms of "contributory negligence" and therefore not quite in line with our con-

clusion that the lack of bed rails was not the proximate cause of the decedent's injury, the following comment from *Fetzer v. Aberdeen Clinic,* 48 S Dak 308, 204 NW 364, 39 ALR 1423, where the patient fell out a window, is apposite, particularly since the rule in this state is that contributory negligence may be shown by a plaintiff's evidence and thereby preclude recovery, (*Pereira v. Star Sand Co.,* 51 Or 477, 94 P 835; *Gentzkow v. Portland Railway Co.,* 54 Or 114, 102 P 614):

> "* * * It is evident that in this case, and in all similar cases, the injuries complained of are directly due to the acts of the person suffering the injuries. Under the general rule of law the contributory negligence of the injured person would bar any recovery on his part, or on the part of his representatives. It is only on the theory that the incapacity of the person injured removes his case from the general rule that any recovery can be had.
>
> "Evidently, then, the burden is clearly upon those seeking to be relieved from this general rule to show such incapacity * * *."

The plaintiff has failed to show as a necessary part of her case that the decedent was not responsible for the accident, and has thereby failed to show that the negligence of the defendant was the proximate cause of her injury. The motions of the defendant were wrongly denied. The assignment of error is sustained.

Reversed.