108 S.E.2d 388 (1959)
200 Va. 878
MEMORIAL HOSPITAL, INC., etc.,
v.
Dora H. OAKES, Adm'x, etc.
Supreme Court of Appeals of Virginia.
May 4, 1959.
*389 Edwin B. Meade, Danville (Meade, Talbott & Tate, Danville, on the brief), for plaintiff in error.
W. Carrington Thompson, Chatham, Theodore P. Huggins, Danville (George E. Bendall, Danville, on the brief), for defendant in error.
Before EGGLESTON, C. J., and BUCHANAN, MILLER, WHITTLE, SNEAD and I'ANSON, JJ.
SNEAD, Justice.
Harmon Washington Oakes, Sr., a patient in The Memorial Hospital, Incorporated, of Danville, was being administered oxygen while he was incased in an oxygen tent when he and the tent caught fire. Oakes received third degree burns and he died the next day. Dora H. Oakes, Administratrix, instituted action for damages under the death by wrongful act statute (§ 8-633 et seq. Code 1950) against the hospital on November 5, 1957. A jury verdict of $12,500 was returned. Defendant's motion to set aside the verdict was overruled and judgment was entered on the verdict. We granted defendant an appeal.
The litigants will be referred to at times as plaintiff and defendant in accordance with their respective positions in the court below.
On January 3, 1957 Harmon Washington Oakes, Sr., age 54, was admitted to The Memorial Hospital as a paying patient on request of his physician, Dr. Asa W. Viccellio. Oakes was suspected of having pneumonia and he was assigned to double room No. 349. Special nurses were not required until after the fire, but he was entitled to and did receive services of the hospital's nurses, supervisors, internes and orderlies *390 upon his admission. Members of his family were frequent visitors to his room. The other bed in the room was occupied by John Thomas Scarborough, III, age 15, who was being treated for a minor ailment.
At approximately 4:30 p. m., on January 5, Dr. Viccellio ordered an oxygen tent for the treatment of Oakes as he had developed pneumonia and uremia. Student nurse Kitty Lee Amos, assisted by practical nurse Mildred Campbell, installed in the room OEM Mechanaire oxygen tent equipment, the type of which was approved and used extensively by accredited hospitals. This particular equipment was defendant's property and was manufactured sometime between 1949 and 1951, and it was connected to a supply outlet in the wall. Oxygen was piped to this and other rooms from an outside tank. Assistant Supervisor Alice Wrenn checked the installation and operation of the equipment. She, as well as nurses Amos and Campbell, testified that the equipment was installed and operated properly before being used in the treatment of Oakes. He was placed under the canopy at approximately 5:30 p. m. of that day.
According to Scarborough, Oakes had smoked cigarettes intermittently up to about the time he was placed under the tent. They were either in the drawer of his bedside table or on top of it and were given him by members of his family. He said that when the oxygen equipment was installed, a "no smoking sign" was hung on the door to the room, and that Miss Wrenn and other nurses cautioned him, Oakes and a visiting lady that it was dangerous for anyone to smoke in the room and they were admonished not to allow any smoking.
Scarborough further testified that at approximately 8:30 p. m. the lights in the room were out with the exception of a dim light at the head of Oakes' bed. At the time he was lying on his right side facing the hall light with his back to Oakes reading a comic book. He said: "I was just laying there and I just saw flames. I couldn't actually see the flames but I noticed there was a glare and I heard a sort of cracking sound or something and I turned over and Mr. Oakes' cuffs and the bottom of the cover and the bottom of the tent was on fire, and he threw up his arms and then it just spread. And I got out of bed and went out to the hall and called for help and I didn't go back in there." When asked whether Oakes' hands were inside or outside of the tent, he replied: "They were inside. I couldn't tell for sure but I feel sure that they were inside." Scarborough had no conversation with Oakes after he was placed under the canopy. He stated he did not smoke or smell the odor of cigarette smoke and did not see any matches lying around. There was no testimony that there was smoking in the room while Oakes was under the tent. Scarborough was asked: "Did you notice anything about the lights before the fire?" and his reply was: "Well, every once in a while there would be a change in the operation of the machine, or something, and the lights beside the bed, before they turned off the main lights, blinked but they didn't go off completely."
Mrs. T. C. Oakes and Mrs. Margaret Moore, mother and sister of plaintiff's decedent, visited the room shortly before the accident and they observed the room to be "awfully hot." Mrs. Oakes said she told the nurse it was too hot in there and to take the tent off her son and raise the window so he could get fresh air, but this was not done.
Reverend J. T. Scarborough, father of John Thomas Scarborough, III, visited his son that evening before the fire. He testified: "I did not notice anything unusual but I did notice that occasionally the tent would swell as if there would seem to be a flow of oxygen and then the tent would go down just a little bit. It would seem to fill out and then each time that that happened the lights in that room would flicker * * *. It sounded as if there was a little roaring sound."
Dr. Viccellio stated he looked in but did not enter the room about ten minutes before *391 the fire occurred and that "[everything seemed to be in perfect order." In describing the equipment he said there is a regulating device which controls the flow of oxygen into the tent and that the flow is continuous.
Ruth Triplett, a supervisor at the hospital, said that between 8:00 and 8:30 p. m. she checked the oxygen gauge and the temperature gauge on the tent and found "everything all right."
D. Sigmon, head mechanic, and Martin Linskey, his helper, moved the furniture and oxygen equipment from the room after the fire. They found the drawer to the bedside table partly open. Sigmon said, among other articles found in the drawer, there were a full package of cigarettes, a partly used package and a cigarette lighter. Linskey recalled seeing only a broken package of cigarettes.
On the day following the tragedy an examination of the oxygen tent equipment, which was in the same condition as it was immediately after the fire, was made by H. B. Ramsey, an employee of the Electrical Department of the City of Danville, B. G. Adkins, its supervisor of Electric Utilities, and B. G. Clarke, an electrical contractor of many years' experience. They testified that they opened the cabinet and found no trace of a fire within it. They found no defects in the electrical or mechanical parts, and when they plugged in the cord connecting the equipment with the current they said it operated normally. On cross-examination they admitted their examination was a cursory one. They did not dismantle the component parts of the unit to check them, and they did not know whether the various units were performing their intended functions.
Dr. George J. Thomas, Director of Anesthesia at University Hospital and St. Francis General Hospital in Pittsburgh, was called as an expert witness for defendant. His affiliation with other institutions and organizations was developed and his qualifications were established. He inspected Room No. 349 before any alterations were made and he also inspected the oxygen tent equipment in the condition it was after the fire. He stated that the equipment in question was approved, accepted and used universally in hospitals. In response to a hypothetical question Dr. Thomas testified: "In my opinion this accident which Mr. Meade described was not due to static electricity nor to dynamic or power electricity." He further stated: "I would like to say, based on our experience of other cases, that a hot flame of some type was the cause of this fire."
On cross-examination he was asked why his opinion was that the oxygen equipment was not defective, and he responded: "Because I understand this machine has been put back into use again and the only repair that was necessary for them to make was to clean up and repaint it and put a new canopy on and we must assume that they did not have any more accidents with that equipment and the equipment was not at fault in this particular accident."
C. Stuart Wheatley, president of the hospital, testified that no compensation was paid the officers and directors of the corporation; that no individual, firm or corporation receives any returns from its operation; that it was strictly a non-profit corporation, and that the corporation does not pay real estate taxes or Federal and State income taxes. He said defendant's goal was not to make money but to break even after depreciation; that it was necessary to have depreciation accounts in order to assure continued operations, and that the hospital was liberal about debt collections. He cited as an example a charge-off of a $3,500 bill although the patient's husband was employed as a sawmill operator.
Defendant has resolved its several assignments of error into three questions for our consideration. They are as follows:
"(1) Does the doctrine of res ipsa loquitur apply to the facts of the case?
"(2) Absent such doctrine, is the evidence sufficient to support a verdict for the plaintiff?
*392 "(3) If the evidence with or without the application of the doctrine of res ipsa loquitur, is sufficient to support a verdict for the plaintiff, is the defendant a charitable hospital and as such entitled to immunity to [from] liability to plaintiff for the negligence of its employees?"
We shall first consider the third question, for if it be held that defendant is a charitable hospital and as such is entitled to immunity from liability to plaintiff for the negligence of its employees, then it will not be necessary in this case to deal with questions one and two.
The trial court considered it unnecessary to decide whether or not defendant was a charitable institution, and the jury was instructed on the question of negligence.
No evidence was adduced to the effect that defendant was negligent in the selection and retention of its employees and plaintiff does not contend that it was negligent with respect to this duty.
We said in Walker v. Memorial Hospital, 187 Va. 5, 7, 45 S.E.2d 898, that the hospital, which is defendant in the instant case, was a charitable corporation. Since then the hospital has been expanded and enlarged. This expansion was made possible by approximately 9,500 public subscriptions in the sum of $1,500,000 and a Federal grant of a like amount which went for capital outlay. It now has 275 beds and employs 400 persons.
In the present case the hospital's charter was introduced in evidence. It provides, among other things, that the corporation "is formed solely for benevolent purposes", and that it "is not organized for profit and no part of the income from the operation of said hospital or nurses' training school of said corporation shall enure to any member or any private individual, corporation or association." It is further provided that the purpose and object of the corporation is "to operate a hospital and nurses' training school which shall, if it is possible so to do, pay its actual expenses and any surplus over and above same shall be devoted to charitable and benevolent work in the treatment of the diseased and afflicted residing in the City of Danville and the surrounding community * * *."
Whether a hospital is charitable or otherwise may be determined not only from the powers and purposes set forth in the charter but also from the manner in which it is conducted. Danville Community Hospital v. Thompson, 186 Va. 746, 753, 43 S.E.2d 882, 173 A.L.R. 525.
There is a presumption that defendant is operating a charitable institution in accordance with its charter purposes. Moreover, the evidence of C. Stuart Wheatley, president and William J. Lees, administrator of the hospital, shows that it has no stockholders; that it is a non-profit corporation; that the officers and directors do not receive compensation for their services; that no individual, partnership or corporation receives any return from its operation; that its goal is to break even after allowance for depreciation; that those who are able to pay are expected to pay, but those who are unable to pay are not pressed for payment and their accounts are charged off, and that no one is refused admittance to the hospital for treatment. Lees also testified that the audits showed that the net loss after depreciation for the years 1952 through 1955 amounted to $178,155.36 and it had a deficit of $30,000 for the current year. The depreciation account for those years amounted to $286,153.47. As of December 31, 1956, the accumulated depreciation fund amounted to $816,863.32. It is a bookkeeping entry and the value is reflected in equipment, buildings and land. The net fixed assets were $3,074,974.97 as of that date. Operating income for 1956 was $1,835,257.11 and the rates were approximately the same as those charged by private institutions. Plaintiff offered no evidence to prove that defendant was not a charitable institution. Based on the record we find that defendant is a charitable institution as a matter of law.
*393 In Weston's Adm'x v. Hospital of St. Vincent, etc., 131 Va. 587, 107 S.E. 785, 23 A.L.R. 907. Durant Weston engaged a room in the hospital for his wife who was expecting to be confined shortly thereafter. He was not cognizant of the fact that the hospital was a charitable institution. Mrs. Weston entered the hospital as a paying patient and she gave birth to a child. A nurse, who had been in training in the hospital for three years, took the child immediately upon birth and gave the child the treatment usually given in such cases. In this process the baby was burned by a hot water bottle and death resulted therefrom within a week. Mrs. Weston qualified as administratrix and instituted suit under the death by wrongful act statute. The trial court sustained a demurrer to the evidence and entered judgment for defendant, which was affirmed on appeal to this court.
It was held defendant was a charitable institution, conducting a hospital solely for philanthropic and benevolent purposes. It was pointed out that it was not conducted for profit, had no stockholders and paid no dividends, that all of its income was used for the support of the hospital, which was not self-sustaining, and that it was operated by the Sisters of Charity of the Roman Catholic Church, who received no income for their services.
Judge Burks, speaking for the court, discussed in detail the grounds and reasoning for immunity from liability of charitable institutions for the negligence of their employees, and he reviewed a number of cases and authorities dealing with the subject. There he said at pages 609, 610 and 611 of 131 Va., at page 792 of 107 S.E.:
"The prevailing opinion in this country is that in a case like the one under consideration the hospital is not liable, and while different reasons have been assigned for the exemption, we believe that the correct basis of the exemption is public policy, and this we conceive to be in effect the holding in the Powers case.[1] For the reasons hereinbefore stated, we limit the application of public policy to beneficiaries of the charity, who have sustained injuries of the character herein complained of, and in their behalf hold that due care shall be exercised by the institution in the selection and retention of their employees. In the class of beneficiaries we include as well those who pay for the service as those who do not. As to the respective rights of charitable institutions and third persons, we adhere to our holding in Hospital of St. Vincent of Paul v. Thompson, supra.[2] We express no opinion on any other question.
* * * * * *
"Upon the authorities cited, and upon principle, we are of the opinion that the duty which the defendant in error owed to the decedent was the exercise of due care in the selection and retention of the nurse in charge of the patient; that negligence in respect of this duty has not been shown, and consequently no error was committed by the trial court in sustaining the defendant's demurrer to the evidence of the plaintiff. The judgment of the trial court will therefore be affirmed."
Thus we see that the doctrine in Virginia was established that a charitable or eleemosynary institution is liable to beneficiaries of the charity for negligence of its employees if it fails to exercise ordinary care in the selection and retention of its employees. But where there has been due care in their selection and retention, a charitable institution is immune from liability to beneficiaries of the charity for their torts. Norfolk Protestant Hospital v. Plunkett, 162 Va. 151, 153, 173 S.E. 363; Stuart Circle Hospital Corp. v. Curry, 173 Va. 136, 148, 3 S.E.2d 153, 124 A.L.R. 176.
*394 Plaintiff contends that today in Virginia, a charitable hospital enjoys no immunity from tort liability for its own negligent acts or those of its servants and employees, and that public policy demands that such a hospital be held liable for its torts and those of its servants.
She argues that when Weston's Adm'x v. Hospital of St. Vincent, etc., supra, was decided in 1921, Virginia was placed among the ranks of the most liberal states with regard to immunity from liability for torts of a charitable institution's servants, and that the question of a charitable hospital's immunity or liability to a patient has not been squarely before this court since that decision. She maintains that the reasons for a valid public policy granting some immunity to charitable institutions no longer exists; that now the weight of authority is against any charitable immunity from tort liability, and that notable text book writers have condemned the doctrine. It is pointed out that Ohio, Washington, Kansas, Colorado, Delaware, New York and New Jersey are among those states which have in the past few years joined the ranks of others denying immunity to charitable institutions for their torts and those of their servants.
Plaintiff cites President and Directors of Georgetown College v. Hughes, 76 U.S. App.D.C. 123, 130 F.2d 810. There Justice Rutledge said at page 827 of 130 F.2d:
"We return therefore to the starting point. The law's emphasis ordinarily is on liability, not immunity, for wrongdoing. Respondeat superior has widened it in an institutionally, and to a large extent corporately, organized community. Charity is generally no defense. When it has been organized as a trust or corporation, emphasis has shifted from liability to immunity. The conditions of law and of fact which created the shift have changed. The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them. The rule of immunity itself has given way gradually but steadily through widening, though not too well or consistently reasoned, modifications. It is disintegrating. Each modification has the justification that it is a step in result, if not in reason, from the original error toward eventual correction. As more and more steps are taken, correction becomes more complete. The process is nearing the end. This leaves the steps untaken standing out as the more anomalous."
Plaintiff says that when the doctrine originated charitable institutions were comparatively few in number, were so poor that a single act of negligence might have destroyed them. Therefore, it was imperative to foster and encourage their creation. She maintains that today, charities are big business, such as the defendant in the case at bar, most of them heavily endowed and too big and strong to be materially affected by a recovery against them for their employee's negligence.
The recent case of Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 141 A. 2d 276 is cited by plaintiff in support of her contention that abrogation of the rule should be effected by the courts who made it and not left to the legislature. There it is said at page 42 of 27 N.J., at page 283 of 141 A.2d:
"The unmistakable fact remains that judges of an earlier generation declared the immunity simply because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation firmly reach a contrary conclusion they must be ready to discharge their own judicial responsibilities in conformance with modern concepts and needs. It should be borne in mind that we are *395 not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts where there can be little, if any, justifiable reliance and where the rule of stare decisis is admittedly limited. * * *"
On the other hand there is respectable authority for not abrogating the doctrine enunciated in Weston's Adm'x v. Hospital of St. Vincent, etc., supra. In the recent case of Knecht v. Saint Mary's Hospital, 1958, 392 Pa. 75, 140 A.2d 30, appellants' sole argument was that the court should repudiate the rule of immunity of charitable organizations from tort liability. The court observed that immunity of an eleemosynary institution has long been the established rule in that state. There it is said at page 78 of 392 Pa., at page 32 of 140 A. 2d:
"A rule of non-liability, even though judge-made, that has become as firmly fixed in the law of this State as has the charitable immunity from tort liability, should not be abrogated otherwise than by a statute made to operate prospectively. If the rule were to be abandoned by court decision, it would lay open to liability all charities for their torts of the past that were not barred by the statute of limitations at the time of the rendition of the rescinding decision. The injustice of such an imposition of liability upon charities that theretofore had a right to rely on the rule of immunity is readily apparent. Whereas, if and when the rule is abrogated prospectively, which the legislature could provide, all charities then made subject to tort liability for the future could protect themselves by appropriate insurance. Moreover, whether * * * the rule as to charitable immunity should be rescinded poses a question of public policy which falls peculiarly within the competence of the legislature."
The court stated in Ettlinger v. Trustees of Randolph-Macon College, 4 Cir., 31 F. 2d 869, 872:
"* * * But, resting upon public policy, the rule rests upon a sufficiently firm foundation. A policy of the law which prevents him who accepts the benefit of a charity from suing it for the torts of its agents and servants, and thus taking for his private use the funds which have been given for the benefit of humanity, which shields gifts made to charity from `the hungry maw of litigation' and conserves them for purposes of the highest importance to the state, carries on its face its own justification, and, without the aid of metaphysical reasoning, commends itself to the wisdom of mankind. * *" See also Bodenheimer v. Confederate Memorial Ass'n., 4 Cir., 68 F.2d 507.
In Williams v. Union County Hospital Ass'n, 234 N.C. 536, 537, 538, 67 S.E.2d 662, 663, the court quoted with approval from Green v. Biggs, 167 N.C. 417, 420, 421, 83 S.E. 553, the following:
"The principle seems to be generally recognized that a private charitable institution, which has exercised due care in the selection of its employees, cannot be held liable for injuries resulting from their negligence, and the rule is not affected by the fact that some patients or beneficiaries of the institution contribute towards the expense of their care, where the amounts so received are not devoted to private gain, but more effectually to carry out the purposes of the charity."
In Cornelius v. Sinai Hospital of Baltimore, Incorporated, Md., 148 A.2d 567, a per curiam opinion by the Court of Appeals of Maryland was rendered on February 17, 1959. There the court was requested to abrogate the doctrine that an eleemosynary corporation, namely a hospital, is not liable for the negligence of its physician. The court observed that its attention had been called to the fact that respected authorities *396 in other jurisdictions had refused to apply the doctrine, and said at page 568:
"The same arguments that are now being advanced for the rejection of the doctrine were made, considered and denied in Howard v. South Baltimore General Hospital, 1948, 191 Md. 617, 62 A.2d 574. No matter what the merit of the argument as an original proposition may be, for this Court now to change the rule would be `judicial legislation' of a very invidious nature. It would not only withdraw the immunity that this Court has repeatedly said exists, without affording any opportunity to those affected to indemnify themselves against loss, but it would impinge the legislative policy established by Code (1957) Article 48A, Sec. 85."
We concede that the wisdom of the rule of immunity as applied to charitable institutions is debatable. But the doctrine which was established in Weston's Adm'x v. Hospital of St. Vincent, etc., supra, is firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State. The General Assembly, though composed of many lawyers of outstanding ability throughout the years, has not seen fit to enact legislation abrogating the doctrine. By its silence, approval might well be inferred. If it be considered desirable to abolish such immunity, it would be more appropriate for the General Assembly to act, for the effect would be to operate prospectively. Abandonment of the rule by judicial decision would be retroactive and give life to tort claims not barred by the statute of limitations at the time of rendition of this opinion. It is probable that many charitable institutions, relying upon the existing doctrine, have not availed themselves of protective insurance or otherwise prepared themselves for such an event. Our re-examination of the subject convinces us that the doctrine laid down in Weston's Adm'x v. Hospital of St. Vincent, etc., supra, should not be abolished by this court, and we adhere to it.
Having reached this conclusion, it becomes unnecessary to discuss questions one and two. The judgment appealed from is reversed, the verdict set aside and final judgment is here entered for defendant.
Reversed and final judgment.
NOTES
[1] Powers v. Massachusetts Homeopathic Hospital, 1 Cir., 109 F. 294, 47 C.C.A. 122, 65 L.R.A. 372.
[2] Hospital of St. Vincent of Paul v. Thompson, 116 Va. 101, 81 S.E. 13, 51 L.R.A.,N.S., 1025.