## CIRCUIT COURT OF ARLINGTON COUNTY

Alfred D. Cox, Admr. of the Estate
of Sally McClelland Cox, deceased

v.

John A. Sanders et al.

August 6, 1970

Case No. (Law) 13035

By JUDGE CHARLES S. RUSSELL

The Court, having considered the evidence adduced on March 17, 1970, with respect to the Plea in Bar of the defendant Arlington Hospital Association raising the defense of charitable immunity, the transcript of testimony, the memoranda of counsel and the oral arguments, is of the opinion that the Plea in Bar should be overruled.

The doctrine of charitable immunity, which came into the law of Virginia in 1914 with *Hospital of St. Vincent* v. *Thompson*, 116 Va. 101 (1914), is now so firmly implanted in our jurisprudence that it is considered wise to leave any modern alteration of it to the General Assembly. *Memorial Hospital* v. *Oakes, Adm'x.*, 200 Va. 878 (1959). Efforts to remove the immunity by legislative action since the *Oakes* case have failed. See *Hill* v. *Memorial Hospital, Inc.*, 204 Va. 501 (1963). It is thus clear that "in Virginia a charitable hospital has, as to its patients, an immunity from liability for negligence, unless it has failed to use due care in the selection and retention of its employees" *Hill* v. *Mem. Hosp., supra*, at p. 507. There is no issue raised in this case with respect to the selection or retention of employees, and there remains only the determination of whether the defen-

dant hospital is a charitable institution entitled to the immunity.

This is a mixed question of law and fact, presented by the defendant hospital's Plea in Bar, upon which it has the burden of proof by a preponderance of the evidence. *The Law of Evidence*, Nash, Sec. 201. The applicable criteria to be viewed in this light are set forth in the *Oakes* case, *supra*, and in *Danville Com. Hosp.* v. *Thompson*, 186 Va. 746 (1947), wherein it was held that the question whether a hospital is charitable or otherwise is to be determined by two tests, i.e., (1) the powers and purposes set forth in its charter, and (2) the manner in which it is conducted. Moreover, the *Oakes* case, *supra*, holds that there is a presumption that a hospital is actually operated in accordance with its charter. 200 Va. at p. 883

Turning, then, first to the charter of the defendant Hospital Association (Def.'s Exhibit # 1) it appears that the certificate of incorporation was filed in 1934 and not amended until after the death of plaintiff's decedent; that it was formed as a non-stock corporation having unlimited duration, limited to real estate holdings of 100 acres, the powers of management of which were vested in a Board of Trustees of 20 members. This body, which had a maximum authorized membership of 25 (increased to 30 by charter amendment in 1967) owned all of the assets of the corporation, was responsible to no other authority and was self-perpetuating. No fixed terms of office were provided by the charter. There were no provisions for removal or retirement. Vacancies in the membership were to be filled by nomination and majority vote of the remaining trustees. At no point does the charter provide that the hospital is to be operated as a charity or without profit to its members. The only mention of the subject of service to indigents appears in article (C) 3:

> To supply modern physical aids in the diagnosis and treatment of disease, and to furnish to the staff of physicians and surgeons who practice in its hospital such physical equipment for the practice of their profession as will enable them to give their best efforts without compensation to those unable to pay for their services, as well as to facilitate them in

their practice on patients who are called on to pay compensation therefor.

The Court construes this as an authorization for staff physicians to render services without charge to indigent patients, but by no stretch of the imagination to commit the hospital to render any free services. Interns are employees of the hospital, but the "staff of physicians and surgeons who practice in the hospital" are independent contractors. *Stuart Circle Hosp.* v. *Curry,* 173 Va. 136 (1939). The Charter contains no provision requiring surplus revenues to be devoted to any charitable purpose and provides no inhibitions against the realization of profits, the furnishing of free services to the trustees and their families, or the payment of compensation to them. As far as the terms of the charter are concerned, the hospital could be operated for the sole profit of the members of the board, if they so desired. Nor do the statutes prohibit such action. See Code Sec. 13.1-205. Indeed, there is no charter prohibition against the closing of the hospital, devoting it to a commercial use or redeveloping and selling the property, dividing the proceeds among the members of the Board. See Code Sec. 13.1-229. Code Sec. 13.1-249c would prevent such distribution of those assets received from charitable contributions subject to limitations on their use, but as will appear later, this protection may be of very limited effect.

In April, 1967, after the death of plaintiff's decedent, the Hospital amended its charter for the sole purpose of increasing its board of Trustees to 30 members. In the caption of this amended certificate, for the first time, it described itself as "non-stock, non-profit corporation." Neither of these terms appeared in the original charter, which was in effect at all times pertinent to this case.

The Court concludes that the charter provides no indicia of the charitable nature of the hospital and that no presumption of charitable operation arises therefrom. Compare *Oakes, supra,* (charter provided hospital organized solely for benevolent purpose, not profit, expressly directing that all surplus over expenses be devoted to charitable and benevolent work; held charitable) and *Danville Com. Hosp., supra,* (charter required net earnings after expenses to be reinvested for the growth and expansion of the hospital; held not charitable).

Turning next to the method of operation of the hospital, the evidence discloses that in 1966, when plaintiff's decedent became a patient, it had gross operating income of $5,640,073.99, and after deducting losses on "professional courtesy"; "losses on contract services" and other allowances and subtracting total expenses of $5,197,492.13, there remained a net profit for the year of $464,607.80 from operations. $227,199.58 of this was set aside for depreciation. There was also income from purchase discounts, interest on delinquent accounts and savings accounts and a single unrestricted contribution item of $50.00, for a net profit after depreciation of $237,408.22. Of this, $20,695.48 was transferred to the building fund, $129,714.66 was used to purchase new and additional equipment, $49,003.20 was applied to capital accounts payable and the remainder added to general funds and carried over to the following year.

This picture was fairly typical of all of the years within the memory of the witnesses. The comptroller could not recall a year when the hospital had operated at a loss. As its expenses grew, its rates were raised to offset them. Its evident purpose was to collect enough operating revenue from its patients to pay its expenses, replace obsolescent equipment and leave a substantial surplus to be contributed each year to growth and expansion. It is now engaged in a ten million dollar building campaign. The funds are to be raised from Arlington County (3 million), the Federal Hill-Burton Act (3 million) and the balance from contributions to the building fund, accumulated savings from operating surplus and, if necessary, loans to be repaid from operating profits. In 1966 the building fund received private contributions of $31,228.38 (contrasted with the $50.00 contribution received for the operation of the hospital) plus the above transfers of surplus from operating profits. Thus the Court cannot conclude that the hospital is operated so as to break even after expenses, but rather to grow, improve and expand. Compare *Weston's Adm'x. v. Hosp. of St. Vincent*, 131 Va. 587 (1921) (hospital unable to pay its expenses from operations; held charitable), *Oakes, supra* (hospital operated to break even after depreciation; held charitable), and *Danville Com. Hosp., supra* (net earnings after expenses used for growth and expansion; held not charitable).

Perhaps the most significant facet of the hospital's operation concerns the treatment of patients. It is undisputed that no patient is turned away due to inability to pay and that the same treatment is given to all, regardless of financial ability. The hospital also maintains the community's only emergency room, provides numerous other essential public services and participates in a teaching program under an arrangement with the Medical School of Georgetown University. Its services to the community are a vital necessity, unique and invaluable, but that is not to say that they are free. It is clear from the evidence that all patients are charged for the hospital's services and that the most vigorous efforts are made to collect the charges in full. No patients are accepted with the understanding at the outset that they are "charity" cases. The term is unknown to the bookkeeping system. The only "charity" patients are seen in retrospect as those as to whom the hospital's bill collectors have failed. The term as used is equivalent to an account receivable charged off as uncollectable.

Patients insured by private and group hospitalization policies and medicare assign the proceeds to the hospital and are billed for the balance. Arrangements are made with other financially responsible patients either to pay in cash before discharge or to sign a note or installment payment agreement before leaving. Eligible patients who are indigent are paid for by the County Welfare Department, although at a reduced rate, and are pressed for payment of the balance. Indigent patients for whom no payment can be received from Welfare, Medicare, outside charity, friends or family are still pressed for payment. The hospital's social service department makes "every effort" to collect from them within ninety days, or, failing that, to work out an installment contract with interest. (Such interest actually collected amounted to $2,992.19 in 1966). If these efforts are unavailing, after a 10-day warning letter the case is turned over to one of three different collection agencies or "credit bureaus." If their efforts are unsuccessful, the case is forwarded to counsel for suit and the usual collection procedures. The evidence shows that 317 such cases were filed in the County Court in Arlington alone in 1966, and six more in the Circuit Court. The Administrator of the hospital estimated that the number of patients ultimately making less than full payment amounted to

less than 5% of the total and that included within this group is the small number who manage to run the collection gauntlet without making any payment at all. These are estimated by the administrator to be 1.5% to 2% of the total number of patients. The Court concludes that the manner of operation of the hospital does no more to establish its charitable nature than does its charter. Compare *Oakes*, *supra*, (liberal policy toward debt collections; those who did not pay were not pressed for payment; held charitable) and *Danville Com. Hosp.*, *supra* (charges entered against each patient which the hospital collected if it could; held not charitable).

Even if the much-maligned "trust fund" theory were the rationale of the doctrine of charitable immunity in Virginia (*St. Vincent* v. *Thompson*, *supra*, *Weston's Adm'x.*, *supra*), the effect of tort liability on any charitable contributions would be minimal indeed, affecting only a $50.00 gift out of $5,640,073.99 revenues in 1966. The immunity is instead based upon broad grounds of public policy. (*Oakes*, *supra*, *Weston's Adm'x.*, *supra*). It is the public policy of the law to avoid casting back upon the community, by the depletion of the assets of charitable hospitals through tort claims, the burden of caring for the indigents who are now given free care. (*Hill*, *supra*). The evidence fails to show that any appreciable effect of this kind would result to the public if Arlington Hospital were required to bear the burden of any torts it might commit. In *Roanoke Hosp. Assn.* v. *Hayes*, 204 Va. 703 (1963), the most recent case upon the subject, the Court remarked that the doctrine of charitable immunity should not be extended, its wisdom not being entirely free from doubt.

The Court concludes that the defendant Hospital has failed to carry its burden of proving that it is a charitable institution, entitled to immunity from tort claims.

Counsel for plaintiff should prepare an order overruling the Plea in Bar.