## CIRCUIT COURT OF THE CITY OF RICHMOND

Elizabeth Ann Rogers

v.

The Virginia Home
and Terri Overby

October 5, 2011

Case No. CL11-187

By Judge T. J. Markow

The parties appeared by counsel on September 20, 2011, for argument on the Defendant's, The Virginia Home's ("Home"), special plea in bar of charitable immunity.

### I. *Background*

The Plaintiff, Elizabeth Ann Rogers, alleges that, on May 17, 2009, she was a resident of the Home pursuant to a written contract. On that date, Rogers, afflicted with cerebral palsy, was confined to her bed when a fire ignited nearby. She could not help herself nor escape due to her disability and the guardrails that secured the sides of her bed. Rogers remained immobile as the fire spread from the bedspread to her left leg, thereby causing third-degree burns. A nurse heard Rogers's moans and, upon investigation, observed that her bed and leg had caught fire. The nurse ran to a nearby sink and, with cups of water, extinguished the fire. Rogers contends, *inter alia*, that the Home negligently maintained a substandard electrical system and safety equipment, which failed to prevent the ignition that caused the fire. Moreover, Rogers claims that the Home negligently hired, trained, and supervised the employees who were charged with her well-being.

The Home filed a special plea in bar of charitable immunity. In support of its plea, the Home presented evidence that it is a recognized public charity organized with a charitable purpose and it operates in accord with

that purpose. The parties agree that Rogers was a resident of the Home prior to and at the time of the alleged incident and that she was a beneficiary of its services. Pl.'s Br. in Opp. at 7. On this basis, the Home claims that Rogers cannot recover from it for her injuries. Rogers argues in opposition that the Home qualifies as a hospital and, therefore, cannot plead charitable immunity. Furthermore, she asserts that the Home's Charter does not set forth a charitable or eleemosynary purpose and, assuming such purpose exists, the Home does not operate in accord with that purpose.

## II. *Analysis*

### A. *Va. Code § 8.01-38*

"The doctrine of charitable immunity 'is firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State'." *Ola v. YMCA of S. Hampton Rds., Inc.*, 270 Va. 550, 556, 621 S.E.2d 70, 72 (2005) (quoting *Memorial Hosp., Inc. v. Oakes*, 200 Va. 878, 889, 108 S.E.2d 388, 396 (1959)). The Supreme Court's prior discussions of charitable immunity have "grounded [the doctrine] in the public policy that the resources of charitable institutions are better used to further the institution's charitable purposes, than to pay tort claims lodged by the charity's beneficiaries." *Id.*

> When a portion of the responsibility [for charity] is borne by the gifts of the philanthropic-minded, so much of the burden is removed from the public. If a portion of those gifts is diverted to the payment of tort claims, without restriction, the spirit and intent of the gifts are, at once, nullified and that much of the burden is again cast upon the public.

*Hill v. Leigh Mem'l Hosp., Inc.*, 204 Va. 501, 507, 132 S.E.2d 411, 415 (1963).

Virginia promotes a limited doctrine of charitable immunity; one that exempts some, but not all, charitable institutions from tort liability. *See Weston v. Hospital of St. Vincent*, 131 Va. 587, 610, 107 S.E. 785, 792-93 (1921). Although a charitable institution is generally immune from liability to its beneficiaries for acts of negligence committed by its servants or agents, it may nevertheless be found liable for the negligent selection and retention of its servants or agents. *Bailey v. Lancaster Ruritan Rec. Ctr., Inc.*, 256 Va. 221, 224, 504 S.E.2d 621, 622 (1998). This immunity, however, does not extend to invitees or strangers who do not enjoy a beneficial relationship to the charitable institution. *Thrasher v. Winand*, 239 Va. 338, 340-41, 389 S.E.2d 699, 701 (1990). Furthermore, a defense of charitable immunity does not extend to liability arising from an institution's willful and wanton

or grossly negligent acts. *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 488, 603 S.E.2d 916, 919 (2004).

The General Assembly, too, has limited the application of the doctrine. One such example is Va. Code § 8.01-38, which denies the defense of charitable immunity to most hospitals:

> Hospital as referred to in this section shall include any institution within the definition of hospital in § 32.1-123.
>
> No hospital, as defined in this section, shall be immune from liability for negligence or any other tort on the ground that it is a charitable institution unless (i) such hospital renders exclusively charitable medical services for which service no bill for service is rendered to nor any charge is ever made to the patient or (ii) the party alleging such negligence or other tort was accepted as a patient by such institution under an express written agreement executed by the hospital and delivered at the time admission to the patient or the person admitting such patient providing that all medical services furnished such patient are to be supplied on a charitable basis without financial liability to the patient.

However, Va. "Code § 8.01-38 is in derogation of the common law of charitable immunity and must be `strictly construed and not . . . enlarged in [its] operation by construction beyond [its] express terms'." *University of Va. Health Servs. Found. v. Morris*, 275 Va. 319, 332, 657 S.E.2d 512, 518 (2008) (quoting *Schwartz v. Brownlee*, 253 Va. 159, 166, 482 S.E.2d 827, 831 (1997)).

Pursuant to Va. Code § 32.1-123, a "hospital" is defined as "any facility licensed pursuant to this article in which the primary function is the provision of diagnosis, of treatment, and of medical and nursing services, surgical or nonsurgical, for two or more nonrelated individuals." In a similar vein, a " `nursing home' means any facility or any identifiable component of any facility licensed pursuant to this article in which the primary function, on a continuing basis, of nursing and health-related services for the treatment and inpatient care of two or more nonrelated individuals." Va. Code § 32.1-123. "Whether [the Home] is a hospital within the meaning of Va. Code §§ 8.01-38 and 32.1-123 is a mixed question of law and fact." *University of Va. Health Servs. Found.*, 275 Va. at 332, 482 S.E.2d at 518.

## B. *The Home Is Not a Hospital*

The Home is a private, state-licensed nursing facility located in the City of Richmond, Virginia, that was founded by an Act of the General Assembly. Although the Home's Charter has been amended over the years,

its charitable purpose has generally remained unchanged, namely, to offer and maintain a comfortable and permanent residence for indigent persons who are afflicted with an incurable physical disability or disease, such as quadriplegia, brain injury, stroke, and degenerative disorder, and to provide said residents with in-house routine medical treatment. Unlike residents in an ordinary nursing home, residents of the Home are younger, they remain at the facility for longer periods of time, they primarily come from private residences rather than hospitals, and because residents are not generally afflicted with chronic conditions associated with infirmity and lack of vigor, they require and engage in more physical activity.

Rogers claims that the Home's services extend beyond those previously mentioned to also include complete twenty-four hour nursing care and medical services, individualized dietary and nutritional services, physical, occupational, and speech therapies, and counseling services. Moreover, the Home procured for its residents an attending physician who is responsible for performing daily rounds and initial physical examinations, evaluating new residents, ordering various treatments and therapies, writing, reviewing, and adjusting prescriptions for medications, and determining whether a resident requires further treatment from a specialist. Accordingly, Rogers argues that the Home qualifies as a hospital and is, therefore, barred from asserting charitable immunity even though it is licensed as a nursing facility. *See* Va. Code Ann. § 8.01-38; *Davidson v. Colonial Williamsburg Found.*, 817 F. Supp. 611, 613 (E.D. Va. 1993) ("In this regard, in 1974, the Virginia General Assembly eliminated charitable immunity for most hospitals, essentially limiting its application to hospitals that provide medical care free of charge." (citations omitted)).

Rogers concedes that the Home "is licensed as a nursing home under the referenced article." Pl.'s Br. in Opp. at 3 (citation omitted). Nevertheless, she asserts that Va. Code § 32.1-123 "plainly includes within its definition of a 'hospital' *any facility* licensed according to the Commonwealth's Hospital and Nursing Home Licensure and Inspection requirements so long as that facility's primary function is the provision of (1) diagnosis, (2) treatment, and (3) medical and nursing services, surgical or nonsurgical." *Id.* at 4 (citation omitted) (emphasis in original). "Because [the Home] is, in fact, licensed under the article and the listed functions are its primary functions, [the Home] should be considered a hospital for purposes of the limitation on charitable immunity set forth in § 8.01-38." *Id.*

The Home does not fall under Va. Code §§ 8.01-38 and 32.1-123. The latter Va. Code section defines "hospital" and "nursing home" as only those "facilit[ies] licensed pursuant to this article." The Home is not licensed to operate as a hospital pursuant to Va. Code § 32.1-123 *et seq.* ("Hospital and Nursing Home Licensure and Inspection"). Rather, from its inception, the Home has been licensed to operate as a nursing facility. Moreover, Rogers fails to indicate whether the Home has ever applied

for or possessed a license to operate as a hospital or whether it has been subject to hospital accreditation. If the General Assembly intended to make indistinguishable a hospital from a nursing facility, then it would not have limited the application of Va. Code § 8.01-38 to hospitals, it would not have defined these institutions separately, and it would not have instituted distinct licensure measures. *See Barr v. Town & Country Props., Inc.*, 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) ("We must also assume that the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute."). Because the Home does not come within the definition of "hospital" in Va. Code § 32.1-123, it does not fall within the scope of Va. Code § 8.01-38's denial of charitable immunity to hospitals.

## C. *The Ola Test and the Scope of Charitable Immunity*

Whether the Home is eligible for common-law charitable immunity from tort liability is a mixed question of law and fact. The Supreme Court recently articulated the test for charitable immunity in *Ola v. YMCA of South Hampton Roads, Inc.*:

> To establish charitable immunity as a bar to tort liability, an entity must prove at least two distinct elements. The absence of either element makes the bar of charitable immunity inapplicable. First, the entity must show it is organized with a recognized charitable purpose and that it operates in fact in accord with that purpose. "In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose."
>
> Second, assuming the entity has met the foregoing test, it must then establish that the tort claimant was a beneficiary of the charitable institution at the time of the alleged injury.

270 Va. 550, 556, 621 S.E.2d 70, 72-73 (2005) (quoting *Davidson*, 817 F. Supp. at 613) (citing *Straley v. Urbanna Chamber of Commerce*, 243 Va. 32, 33, 413 S.E.2d 47, 48 (1992); *Thrasher v. Winand*, 239 Va. 338, 340-41, 389 S.E.2d 699, 700 (1990)).

Concerning the first element:

> if an organization's charter sets forth a charitable or eleemosynary purpose, there is a *rebuttable presumption* it operates as a charitable institution in accordance with that purpose. However, if the manner in which the organization

actually conducts its affairs is not in accord with the charitable purpose, then the presumption may be rebutted and the bar of charitable immunity does not apply.

*Id.* at 557, 621 S.E.2d at 73 (citing *Memorial Hosp., Inc. v. Oakes,* 200 Va. 878, 889, 200 Va. 388, 392 (1959); *Danville Cmty. Hosp. v. Thompson,* 186 Va. 746, 753, 43 S.E.2d 882, 884 (1947)). The Court established ten factors by which to ascertain whether a charitable institution actually operates with a charitable purpose:

> (1) Does the entity's charter limit the entity to a charitable or eleemosynary purpose?
> (2) Does the entity's charter contain a not for profit limitation?
> (3) Is the entity's financial purpose to break even or earn a profit?
> (4) Does the entity in fact earn a profit, and if so, how often does that occur?
> (5) If the entity earns a profit (a surplus beyond expenses) must that be used for a charitable purpose?
> (6) Does the entity depend on contributions and donations for a substantial portion of its existence?
> (7) Is the entity exempt from federal income tax and/or local real estate tax?
> (8) Does the entity's provision of services take into consideration a person's ability to pay for such services?
> (9) Does the entity have stockholders or others with an equity stake in its capital?
> (10) Are the directors and officers of the entity compensated and if so, on what basis?

*Id.* at 557, n. 1; 621 S.E.2d at 73, n. 1 (citing *Bailey v. Lancaster Ruritan Rec. Ctr., Inc.,* 256 Va. 221, 225, 504 S.E.2d 621, 623 (1998); *Oakes,* 200 Va. at 883, 108 S.E.2d at 392; *Weston v. Hospital of St. Vincent,* 131 Va. 587, 590, 107 S.E. 785, 786 (1921)). These factors are neither exclusive nor determinative. *Id.* at 557, 621 S.E.2d at 73.

### 1. Presumption That the Home Operates with a Charitable Purpose

The Home is entitled to the presumption that it operates as a charitable institution in accordance with the purposes set out in its Charter. Originally operating under the name of the Virginia Home for Incurables, the Home was chartered in 1958:

to establish, provide, and maintain within this State a comfortable and permanent home for indigent [] citizens of this State afflicted with an incurable physical disability or disease not malignant or contagious, and to provide such inmates with proper medical treatment and attendance. . . .

> *The Corporation is organized and shall be operated exclusively for charitable and benevolent purposes.*

Def.'s Br. in Supp. Ex. 2 (emphasis added). This language, "[t]he Corporation is organized and shall be operated exclusively for charitable and benevolent purposes," is similar to that used in the YMCA's articles of incorporation the Supreme Court found in *Ola* to create a rebuttable presumption that the YMCA was a charitable institution: "Article II(A) mandates that the YMCA `shall be operated exclusively for one or more charitable, religious, education, and scientific purposes'." *Ola*, 270 Va. at 559, 621 S.E.2d at 74. Accordingly, the Home's Charter establishes the rebuttable presumption that it is a charitable institution, and Rogers has the burden of rebutting this presumption. The Home is recognized as a public charity by the Internal Revenue Service and Virginia. Def.'s Br. in Supp. at 5-6.

### 2. *Presumption Is Not Rebutted*

Although the Home's Charter expresses a charitable or eleemosynary purpose and is, therefore, entitled to the presumption that it operates as a charitable institution in accord with that purpose, "[i]f the manner in which [the Home] actually conducts its affairs is not in accord with the charitable purpose, then the presumption may be rebutted and the bar of charitable immunity does not apply." *Id.* at 557, 621 S.E. at 73. As previously stated, the Supreme Court, in *Ola*, set forth ten factors that are demonstrative of whether an institution operates with a charitable purpose. These factors "are not exclusive and the presence or absence of any particular factor is not determinative." *Id.* Rogers asserts that the Home does not operate as a charitable institution even though its Charter advances a charitable purpose.

"[W]hether an entity operates as a charity turns on the facts of each case." *Id.* In this case, the Court finds the following factors determinative of the conclusion that the Home operates with a charitable purpose: (a) the Home is exempt from federal income tax and local real estate tax, Def.'s Br. in Supp. at 5-6; (b) the Home has no stockholders or others with an equity stake in its capital, *id.* at 5; (c) the Home's Board of Trustees is not compensated, *id.*; (d) the Home's Charter is limited to a charitable or eleemosynary purpose, *id.* Ex. 2 ("The Corporation is organized and shall be operated *exclusively* for charitable and benevolent purposes") (emphasis added); and (e) although the Home's Board of Trustees may "invest and re-invest the proceeds" and "establish and maintain one or more common accounts or funds for the investment of the moneys of the Corporation,"

"no part of the net earnings of the Corporation shall inure to the benefit of any Member, Trustee, or individual"; rather, "[a]ny moneys derived from such common accounts or funds, whether by way of principal or interest, shall be applied to the general purposes of the Corporation." *Id.*

Rogers asserts that the Home does not actually operate with a charitable purpose because it generally earns a profit. For example, from 2005 to 2008 and 2010, the Home earned "excess," or "revenues and gains over expenses and losses." However, a closer examination of the Home's financial statements also reveals that its operating expenses have consistently outpaced its operating income, the bulk of which is derived from Medicaid reimbursements. Without the use of outside revenue sources such as investment income, gifts, and bequests, and income from estates and trusts, including an $80 million endowment fund, the Home would stand on financially unstable ground. In fact, in 2009, the year of the alleged incident, the Home operated with a net loss of $3,864,667.00 even with the aforesaid revenues and gains. If the Home cannot use outside revenue streams and instead relies entirely on income derived from Medicaid reimbursements, its operating expenses would continue to outpace its income, and the Home would cease to exist as an economically viable institution. Moreover, even if the Home relies exclusively on income derived from gifts and bequests, rather than investment income, or *vice versa*, such revenue would nonetheless be insufficient to offset its losses. *See* Def.'s Br. in Reply at 8 ("In none of those years . . . did funds from Medicaid, resident payments, and/or any other payment source cover the cost of operations of The Home; contributions and donations, both past and present, were necessary in every one of those years to cover the costs of operations of The Home."); *id.* at 10 ("Annual contributions alone would not have allowed The Home to be a residence to 130 severely disabled adults.").

If the Court agrees with Rogers and finds that the Home does not actually conduct its affairs with a charitable purpose, then it would effectively hold the Home accountable for any monies derived from its practical investment strategies, thereby running counter to the Uniform Prudent Management of Institutional Funds Act. Pursuant to Va. Code § 55-268.14(A), "an institution may appropriate for expenditure or accumulate so much of an endowment fund as the institution determines is prudent for the uses, benefits, purposes, and duration for which the endowment is established." In accordance with this principle, the Home's Board of Trustees

> hopes to make available . . . roughly 5% of total assets on an annual basis to be applied toward operations. . . . However, if the corpus of the endowment remained the same from one year to the next, the amount represented by that 5% would cover a continually decreasing amount of The Home's costs, as inflation drove costs up annually. Therefore, as part of The

> Home's investment strategy, the Board seeks to grow the corpus of the endowment so that the 5% of total assets contribution from the endowment continues to cover a significant amount of the costs for the operation of The Home. Additionally, as part of the investment strategy for The Home, the Board seeks to earn sufficient interest/dividends on the endowment fund to cover annual costs of maintaining/managing the fund without reducing the corpus of the fund subject to the 5% spending allocation. Therefore, the investment strategy of The Board seeks 10% annual growth so that the endowment fund will continue to grow and generate increasing revenues to cover inflating operational costs as well as covering the costs of fees for maintenance of the fund and still allowing 5% withdrawal of assets from the endowment toward The Home's operations.

Def.'s Br. in Reply at 10-11. Accordingly, the Home is wary of depleting its corpus, its "safety net," in order to offset its operating losses, and justifiably so.

Rogers is also incorrect in asserting that the Home's "endowment fund has grown to a substantial amount based upon the profits earned," Pl.'s Br. in Opp. at 12, nor is she correct in claiming that the Home "earn[ed] substantial net profits in the years 2005 through 2008." *Id.* at 9. "The word `profit' is defined in *Black's Law Dictionary* (3d ed.) as `The advance in the price of goods sold beyond the cost of purchase'." *Oliver v. Halstead,* 196 Va. 992, 994, 86 S.E.2d 858, 859 (1955). If one substitutes "goods sold" for "services rendered" and "the cost of purchase" with "operating expenses," the Home cannot be viewed as a profit-making enterprise, particularly given that its operating expenses have consistently outpaced the revenues derived from its services. The Court cannot integrate into this calculus the income produced from the Home's investments because doing so would stretch the definition of "profit" beyond that which it may bear. For example, a store does not become profitable merely because a person who operates it at a loss makes gains elsewhere from independent, outside investments. Thus, although the Home earns a profit from its investments, the same cannot be said of its services.

Contrary to Rogers's claim, there is no requirement that a charitable institution's charter or articles of incorporation include a not-for-profit limitation. Although this language is indicative of whether an institution operates with a charitable purpose, the absence of this limitation in the Home's Charter is belied by its promise that "no part of the net earnings of the Corporation shall inure to the benefit of any Member, Trustee, or individual." Def.'s Br. in Supp. Ex. 2. In a similar vein, a charitable institution is not obligated to consider a person's ability to pay as a requisite for the provision of services. Even though such consideration

is demonstrative of whether an institution conducts its affairs in accord with its charitable purpose, the fact remains that admission to the Home is not dependent on a resident's ability to pay, and, moreover, almost all of the Home's residents, over ninety-seven percent, are Medicaid-eligible and are, therefore, unable to independently afford nursing care. Of those residents who are not entitled to Medicaid, they are required to pay only as much as their Medicaid-eligible counterparts pay, namely, the amount Medicaid reimburses the Home. Lastly, the implication that the purchase of an adjacent parcel of land, two private residences, and a guesthouse undermines the Home's stated charitable purpose is overshadowed by the Home's affirmation that the aforesaid properties were purchased and will be utilized, when necessary, for future expansion.

Rogers also complains that two persons on the now-defunct Men's Advisory Board, which was composed of "busy lawyers, bankers, and businessmen," Def.'s Br. in Reply at 9, were employed in investment firms that managed the bulk of the Home's endowment fund. She alleges that these firms received a substantial benefit from their activities and that this is inconsistent with the Home's stated charitable purpose. There is no evidence, however, that these individuals or entities were directly compensated or advantaged in their associations with the Home. In fact, "the firms for whom the referenced MAB members worked gave reduced commission rates on trades on the behalf of The Home relative to what would have been charged to other customers. They charged nothing for the advice and guidance regarding investment options which was provided to The Home." *Id.* at 9-10. Other members of the Men's Advisory Board, which was charged with advising and guiding the Board of Trustees, "had no voting authority in regard to the assets/operations of The Home, none of their members was a member of the Board of Trustees, and they received no compensation for the services they rendered to The Home." *Id.* at 9. To find that the Home somehow violated its stated charitable purpose by utilizing outside parties to assist in the administration of its financial affairs would run contrary to Va. Code § 55-268.15(A), which provides that "an institution may delegate to an external agent the management and investment of an institutional fund to the extent that an institution could prudently delegate under the circumstances."

### III. *Conclusion*

When the aforesaid factors are considered in the context of *Ola*, it is clear that the manner in which the Home actually conducts its affairs is in accord with the charitable purpose set forth in its Charter. Furthermore, Rogers concedes that she was a beneficiary of the Home's services. Pl.'s Br. in Opp. at 7. The Home is, therefore, immune from tort liability under the doctrine of charitable immunity. Accordingly, the Home's special plea

in bar of charitable immunity as to Rogers's claim of negligence contained in Count One of her Complaint is sustained.